Approved: _____
BRIAN D. COAD
RICHARD D. OWENS
Assistant United States Attorneys

Before:   ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :    SEALED COMPLAINT

  - v -                             :    Violation of
                                         15 U.S.C. Sections
MARTIN ARMSTRONG,                   :    78j(b) and 78ff

              Defendant.            :    COUNTY OF OFFENSE:
                                         NEW YORK
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    Anthony L. Zampogna, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

### COUNT ONE
### (Securities Fraud)

    1.    From in or about 1997 through in or about September 1999, in the Southern District of New York and elsewhere, MARTIN ARMSTRONG, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, by (1) employing devices, schemes and artifices to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers of securities issued by Princeton Global Management Ltd. and affiliated entities.

    (Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2).

The bases for my knowledge and for the foregoing charges are, in part, as follows:

2. I have personally participated in the investigation of the above described offenses. From my personal participation in this investigation, from my conversations with other FBI agents and law enforcement personnel involved in this investigation, my and other agents' interviews of witnesses and sources, and my and other agents' review of business records and other documents gathered in the course of the investigation, including documents seized in the execution of a search warrant, I am familiar with the facts and circumstances of this investigation.[1] Because this affidavit is being submitted for the limited purpose of establishing probable cause to secure an arrest warrant, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part.

### The Relevant Persons and Entities

3. From my review of publicly available documents and conversations with other FBI agents, the United States Securities and Exchange Commission ("the SEC"), the United States Commodities and Futures Trading Commission ("the CFTC"), and attorneys representing Republic National Bank of New York ("Republic Bank"), and review of documents seized in the execution of a search warrant, I have learned the following:

a. Republic New York Securities Corporation. ("Republic Securities") is a broker-dealer of securities registered with the SEC. Republic Securities is also a futures commission merchant registered with the CFTC. Republic Bank and Republic Securities are owned by a common parent corporation. From time to time, officers and employees of Republic Bank are assigned to perform audits and reviews related to the affairs of Republic Securities.

---

[1] On September 1, 1999, the Hon. Joel A. Pisano, United States Magistrate Judge for the District of New Jersey, issued search warrants for the offices of certain companies controlled by MARTIN ARMSTRONG, the defendant, located in Princeton, New Jersey. I personally participated in executing those warrants ("the Princeton Search"). During the search other agents and I seized numerous computers and more than approximately thirty boxes of documents. While I have endeavored to review as many of the seized documents as possible, I have not yet completed a full review of all of the seized materials.

2

b. Republic Securities operates a Futures Division. Approximately ninety percent of the business conducted by the Futures Division relates to accounts controlled by MARTIN ARMSTRONG, the defendant.

c. At all times relevant to this complaint, Princeton Economics International, Ltd. ("PEI") was a corporation organized under the laws of the Turks and Caicos Islands, British West Indies. MARTIN ARMSTRONG, the defendant is a director of PEI. PEI's headquarters is in Princeton, New Jersey. PEI purports to provide investment advisory and other financial consulting services. MARTIN ARMSTRONG controls PEI and its various affiliated companies.

d. Princeton Global Management, Ltd. ("PGM") is a corporation organized under the laws of the Turks and Caicos Islands, British West Indies. MARTIN ARMSTRONG is a director of, and controls, PGM. PGM's activities are primarily conducted from the PEI offices in Princeton, New Jersey.

e. At all times relevant to this complaint, Cresvale International, Ltd. ("Cresvale"), a corporation organized under the laws of the Cayman Islands, was a wholly-owned subsidiary of PEI. Cresvale International, Ltd., Tokyo Branch ("Cresvale-Tokyo") is a wholly-owned subsidiary of Cresvale International, Ltd. Cresvale-Tokyo's office is located in Tokyo Japan. Cresvale-Tokyo is a broker-dealer of securities in Japan. MARTIN ARMSTRONG is the chairman of Cresvale and Cresvale-Tokyo.

[handwritten annotation: False / Not dir of TC]

### The Securities Sold To Japanese Investors

4. From conversations with officials of the SEC and attorneys representing Republic Bank, I have learned the following:

a. The Financial Supervisory Agency of Japan ("the FSA") is an agency of the Government of Japan charged with, among other duties, supervising banking and securities activities in Japan.

b. On or about August 18, 1999, officials of the FSA forwarded a request for information to the Federal Reserve Bank and Republic Bank. The FSA's request stated that in the course of reviewing the affairs of Cresvale-Tokyo, the FSA determined that over the last several years Cresvale-Tokyo has sold to Japanese investors various securities ("the Princeton Notes") with a total face value in excess of approximately $3

3

billion and that, of those Princeton Notes, approximately $1 billion were still outstanding.[2] The FSA's request further indicated that Japanese purchasers of the Princeton Notes had been lead to understand that "all customer's money are [sic] held in Segregate Account of Republic New York Securities."

5. From my review of documents seized during the Princeton Search, as well as documents provided, via Republic Bank, by a Japanese investor that purchased a so-called "Princeton Note," I have learned the following concerning the basic structure and some of the more common terms of the securities sold by MARTIN ARMSTRONG:

a. During the course of the Princeton Search, other agents and I seized numerous separately labeled files which appear to contain the transactional documents for one or more Princeton Notes. I estimate that the total number of such files seized is greater than approximately 300, representing a total of approximately 300 individual Princeton Notes. There is some variation among the notes in terms of the date of issue, the principal amount, the stated interest rate, and the maturity date. However, many other terms and conditions of the notes are similar. Each of those notes appears to have been issued by a different entity. Each of those entities is controlled by MARTIN ARMSTRONG (collectively "the Princeton Note Issuers"). These issuers operate under a variety of names, each of which is derived from the basic name "Princeton Global Management [x] Limited," where [x] is a variable which relates in some way to the name of the investor(s) who purchased notes issued by that entity. From my review of documents provided by Republic Securities, the names of the issuers appear to include, for example, "Princeton Global Management M-3 Limited," "Princeton Global Management KSG-1 Limited," "Princeton Global Management KSG-10 Limited," "Princeton Global Management NBK Limited," and "Princeton Global Management NKS-56 Limited."

b. For each Princeton Note issued, it appears that the following transactional documents, among others, were regularly generated: (1) a promissory note signed in the name of MARTIN ARMSTRONG; (2) a document entitled "Conditions of the Notes" which purports to set forth certain representations and warranties from the issuer to the noteholder; (3) an "Investment Management Agreement" between the issuer and Princeton Economics

---

[2] Although the initial request from the FSA stated that sales had approximated $30 billion with $10 billion outstanding, later communications from the FSA indicated that the actual figures were $3 billion and $1 billion, respectively.

4

International (ASIA) Limited ("PEI-Asia"), signed in the name of MARTIN ARMSTRONG on behalf of all parties; and (4) an "Investment Advisory Agreement" between the issuer, PEI-Asia, and PEI, signed in the name of MARTIN ARMSTRONG on behalf of all parties.

    c.    Some of the notes are issued in the name of the purchasers and others are issued in the name of Cresvale-Tokyo as a nominee for the purchaser. Some of the notes pay fixed and others pay variable rates of interest. Although all of the documents I have reviewed to date indicate that the notes are unsecured, repayment of some of the notes are guaranteed by PEI.

    d.    The notes are issued in varying principal amounts, sometimes stated in U.S. dollars and sometimes stated in Japanese yen. Although some of the fixed-rate notes are issued in U.S. dollars, both principal and interest payments due under those note are to be paid in Japanese yen. At least a few of the fixed rate notes that I have reviewed appear to carry actual rates of return far in excess of their stated interest rates as a result of the fact that the dollar/yen exchange rate used in the notes substantially differed from market rates prevailing at the time the notes were issued. In some instances I have found that the actual rate of return on the notes is greater than 20 percent even though the stated interest rate is 4 percent.[3]

---

[3]    In at least some instances, it appears that the actual rate of return on the fixed-rate notes is far greater than the simple interest rate stated on the face of each note. For example, I have been informed by attorneys for Republic Bank that they have analyzed one note which they received from a Japanese investor. The stated rate of interest on that note is 4 percent. However, that note's actual rate of return is in fact approximately 24 percent -- nearly 20 percent greater than the 4 percent interest rate stated in the note. The additional gain in the rate of return works as follows. The note was sold for $10,420,000 but must be repaid in an "equivalent" amount of ¥1.5 billion. The Note further specifies that interest will be calculated on the basis of the specified yen equivalent amount. However, applying the yen/dollar exchange rate applicable on the date of the Note's issuance, the specified yen value of the note is substantially greater than the dollar amount actually invested. Accordingly, the rate of return on the dollar investment, when calculated on the basis of the inflated yen equivalent, yields a return of approximately 24 percent. In other words, at the time the Note was issued, the parties used an exchange rate different from prevailing market rates and that effectively undervalued the dollar and overvalued the yen. The Note thereby provides an additional 20% return to the investor

e. According to the "Conditions of the Notes," the proceeds received from the sale of the notes of a particular Princeton Note Issuer are to be used to establish a fund (the "Trading Fund") for that issuer. The "Conditions of the Notes" also impose certain limitations on the use of the proceeds. In substance those limitations require that, so long as any of the notes of a particular Princeton Note Issuer are outstanding, the proceeds of the sales of the notes are to be used solely to conduct trading activity through the related Trading Fund, to pay related expenses and fees, and to pay principal and interest due on outstanding notes. Nothing in the "Conditions of the Notes" allows for one Princeton Note Issuer to pay the debts and obligations of another Princeton Note Issuer or to commingle their assets.

f. According to the "Conditions of the Notes" and the Investment Management Agreements, the Trading Funds are managed by Princeton Economics International (Asia), Limited ("PEI-Asia") in conjunction with PEI as Investment Advisor. PEI-Asia is to receive management and performance fees for its services to a Trading Fund. Republic Securities is designated as the fiduciary and custodian of the assets of the Trading Funds. The Investment Management Agreements further provide in substance that (1) the Trading Funds shall consist of "derivative instruments, bonds and/or currencies available in the world financial markets, including futures and options," and (2) the investment manager is authorized to actively manage such investments.

6. Attached hereto as Exhibit 1 is a document provided by the FSA to Republic Bank which purports to set forth, in the form of a chart, the relationship among various parties involved in the issuance of the Princeton Notes and the management of the various related Trading Funds.

## The Princeton Global Account at Republic Securities

7. From conversations with officers of Republic Bank and Republic Securities, my review of account records maintained by Republic Securities, and my review of schedules and memoranda prepared at various times during 1998 and 1999 by officers and employees at Republic Securities, I have learned the following

---

when the investment, which was purchased in dollars, was repaid in yen. I have found approximately four additional fixed rate notes which also appear to have effective rates of return significantly in excess of the stated interest rate as a result of a similar manipulation of the exchange rate calculations.

concerning the structure and operation of certain accounts maintained at Republic Securities and controlled by MARTIN ARMSTRONG.

a. During the last several years, MARTIN ARMSTRONG has maintained a variety of accounts at Republic Securities that appear to have contained funds raised from the sale of the Princeton Notes. By no later than in or about 1998, many of these accounts were replaced by a single account, namely the Princeton Global Account. That account was established in the name of Princeton Global Management Ltd. and is controlled by MARTIN ARMSTRONG. The Princeton Global Account consists of approximately 8 trading sub-accounts (the "Trading Sub-Accounts") and numerous sub-accounts established by PEI, from time to time, that appear to contain the proceeds of the sales of Princeton Notes (the "Investor Sub-Accounts"). Moreover, it appears that, since sometime in 1998, MARTIN ARMSTRONG has caused a separate Investor Sub-Account to be created for each Princeton Note Issuer. For example, there is a sub-account in the name of "Princeton Global Management Sub a/c M-3" that appears to correspond to a Princeton Note Issuer incorporated as "Princeton Global Management M-3, Limited." Each of the Investor Sub-Accounts is supposed to contain the proceeds from the sale of Princeton Notes to a particular investor or from the sale of notes by a particular Princeton Note Issuer. Account opening documents for the various Investor Sub-Accounts, as well as the names on those accounts, appear to coincide with the names of particular Princeton Note Issuers. Attorneys of Republic Bank and Republic Securities have informed me that, as of August 31, 1999, there were approximately 113 Investor Sub-Accounts at Republic Securities.

b. Little or no trading activity occurs in the Investor Sub-Accounts. Instead, nearly all trading activity occurs in the Trading Sub-Accounts. MARTIN ARMSTRONG directs the trading in the Trading Sub-Accounts, and profits and losses in the Trading Sub-Accounts are allocated to the various Investor Sub-Accounts according to instructions transmitted to Republic Securities by MARTIN ARMSTRONG or other employees of PEI.

8. It appears that, contrary to the "Conditions of the Notes," MARTIN ARMSTRONG, the defendant, has commingled the proceeds from the sales of different Princeton Notes and may have used the funds of one Princeton Note Issuer to repay the obligations of another. Attorneys for Republic Securities have informed me that their auditors have learned that assets in the Investor Sub-Accounts were regularly transferred to and from the Trading Sub-Accounts, and between Investor Sub-Accounts at the direction of MARTIN ARMSTRONG or his employees at PEI. From my

preliminary review, records seized at PEI appear to confirm that there were frequent transfers to, from and between the Investor Sub-Accounts and the Trading Sub-Accounts at the direction of MARTIN ARMSTRONG or his employees at PEI. During the course of the Princeton Search, another FBI agent interviewed a PEI employee with daily administrative responsibilities for the Princeton Global Account ("the PEI Employee"). The PEI employed indicated that monies were commonly transferred between the Investor Sub-Accounts at the direction of MARTIN ARMSTRONG and that, whenever a Princeton Note became due, the note would be repaid from any available funds.

9. I have been advised that attorneys for Republic have directed auditors to review cash movements into and out of the Princeton Global Account. I understand that those attorneys have reported preliminary findings that, from in or about March of 1998 through in or about the present, more than approximately $750 million has been transferred from various Cresvale entities in Japan to the Princeton Global Account and allocated to various Investor Sub-Accounts according to instructions transmitted to Republic Securities by MARTIN ARMSTRONG, the defendant, or other employees of PEI. During that same period of time, approximately $925 million has been transferred out of the Princeton Global Account to various bank accounts around the world, including many accounts that appear to relate to Cresvale entities and other companies in Japan.

### The Massive Recent Losses In The Trading Sub-Accounts

10. I have been advised by attorneys for Republic that trading accounts in the names of certain Princeton Note Issuers were opened at Republic Securities at least as early as February 1995. However, records of Republic Securities indicate that the current eight Trading Sub-Accounts were opened at Republic Securities in or about November 3, 1997. Auditors hired by Republic Bank since the receipt of the FSA's informational request have reviewed the trading activity in the eight Trading Sub-Accounts and determined that the trading activity has generated enormous losses. According to the auditors, between November 13, 1997 and August 31, 1999, the combined net losses in the Trading Sub-Accounts, including commission charges and margin interest, exceeds $504,000,000. The auditors have reported that there have been some relatively small trading gains and interest income in the individual Investor Sub-Accounts. These gains and income have come from the fact that some of the Investor Sub-Accounts have, from time to time, held U.S. Government Treasuries and Agency Bonds.

8

11. It appears that the principal amount of the Princeton Notes currently outstanding is substantial. As noted above, the FSA has indicated that the balance of the currently outstanding Princeton Notes totals approximately $1 billion. During the Princeton Search, the PEI Employee claimed not to know the precise outstanding balance but stated that, at its peak, the amount outstanding was approximately $700 to $800 million.

12. I have recently been informed by representatives of Republic Securities that the total assets remaining in the Princeton Global Account, including all of the Trading Sub-Accounts and all the Investor Sub-Accounts, is approximately $46 million. The PEI Employee has acknowledged to another FBI agent that there are not enough funds in the Princeton Global Account to pay back principal and interest on the outstanding Princeton Notes, estimating the shortfall as several hundred million dollars. The PEI Employee also stated in substance that the PEI Employee is aware of no account, other than the Princeton Global Account at Republic Securities, that contains funds derived from the sale of the Princeton Notes or otherwise collateralizes the outstanding Princeton Note obligations.[4]

### The Misleading Confirmation Letters

13. I have been informed by representatives of Republic Securities that during the past several weeks since receipt of the FSA's informational request, internal auditors have discovered evidence that the president of Republic Securities' Futures Division provided false net asset value confirmations to MARTIN ARMSTRONG, the defendant, and at least one Japanese investor at MARTIN ARMSTRONG's request. Republic officials have discovered in Republic Securities' files approximately 200 Confirmation Letters that purport to confirm net asset values in certain of the Investor Sub-Accounts. I have reviewed copies of many of these Confirmation Letters. These Confirmation Letters are addressed to MARTIN ARMSTRONG and are signed by the president of the Futures Division. Each of these letters refers to a specific Investor Sub-Account in the name of

---

[4] In connection with this investigation, on September 2, 1999, upon application by the Government, The Honorable Sharon E. Grubin, United States Magistrate Judge for the Southern District of New York, issued a seizure warrant for the Princeton Global Account at Republic Securities. Pursuant to the warrant, on September 2, 1999, The Government seized the account and, by order of the Court, Republic Securities has been appointed as a substitute custodian.

9

a particular Princeton Note Issuer and states the purported net asset value of cash and securities in that sub-account on a specific date. A copy of one such letter is attached hereto as Exhibit 2.

14. Representatives of Republic Bank have informed me that, under Republic Securities' standard operating procedures, the president of the Futures Division was not authorized to issue such Confirmation Letters. Instead, such letters are to be provided by "back-office" personnel or internal auditors.

15. Representatives of Republic Bank have informed me that internal auditors have reviewed the Confirmation Letters and compared the net asset value representations contained in those letters to the actual net asset values reflected in Republic Securities official books and records. From their review, the internal auditors have determined that in nearly all instances, the Confirmation Letters falsely overstate the value of assets in the Investor Sub-Accounts. The auditors' work papers reveal that the Confirmation Letters overstatement of assets in the Investor Sub-Accounts generally ranged from approximately a few thousand dollars to as much as approximately $46 million.

16. Attorneys for Republic Bank and Republic Securities have advised me that they have interviewed the Futures Division President concerning the Confirmation Letters and some of his business dealings with MARTIN ARMSTRONG. The Futures Division President stated, in substance and in part, that: (1) he had a close relationship with MARTIN ARMSTRONG and that ARMSTRONG constituted approximately 90% of his business at Republic; (2) he caused the Confirmation Letters to be prepared as a result of specific requests from ARMSTRONG and other employees of PEI; (3) from time to time ARMSTRONG and other employees of PEI requested confirmation letters for specific Investor Sub-Accounts and indicated specifically what net asset values the Confirmation Letters should confirm; (4) he signed the Confirmation Letters personally or authorized another Republic Securities employee to sign his name. The Futures Division President claimed that he did not generally confirm the accuracy of the Confirmation Letters. He did state that, from time to time, he noticed discrepancies between the actual net asset values for specific Investor Sub-Accounts and the values that ARMSTRONG requested to be confirmed. In those instances, the Futures Division President claimed that he issued the Confirmation Letters with the values requested by ARMSTRONG but spoke with ARMSTRONG about the discrepancies and asked that ARMSTRONG transfer funds from another Investor Sub-Account to make the values in the Confirmation Letters accurate. The Futures Division President indicated that the Confirmation

Letters were sent to ARMSTRONG at PEI's offices in Princeton, New Jersey. The Futures Division President also stated that he was aware of at least one instance in which a Confirmation Letter had been provided to one of ARMSTRONG's investors.

17. Attorneys for Republic Bank and Republic Securities have also advised me that the Futures Division President stated in his interview that, during the last twelve months, losses from ARMSTRONG's trading activity in the Princeton Global Account had substantially exceeded profits.

18. The PEI Employee has recently stated in an interview that Japanese investors in the Princeton Notes were entitled at any time to receive the Confirmation Letters. The PEI Employee also stated, in substance and in part, that the procedure for obtaining a confirmation letter was as follows:

a. PEI would determine the amount to be confirmed on a particular Princeton Note by determining the note's face value and adding to that sum the amount of interest that was supposed to have accrued on the note. Pursuant to MARTIN ARMSTRONG's direction, this figure would be provided to officials at Republic Securities along with a request that Republic Securities issue a Confirmation Letter using the PEI-supplied figure as the net asset value of the account.

b. The Futures Division President would then provide PEI with a Confirmation Letter containing the net asset value supplied by PEI. If the actual balance in the Investor Sub-Account was less than the PEI-calculated net asset value, funds from other Investor Sub-Accounts generally were transferred to cover the shortfall. The Futures Division President would issue the Confirmation Letter in the amount requested by PEI, regardless of whether the amount that PEI specified was more than was actually in the Investor Sub-Account. PEI employee stated that transferring funds from one Investor Sub-Account to another was a common practice.

19. Attorneys for Republic Securities have advised me that, in the normal course of business, MARTIN ARMSTRONG was provided, on an almost daily basis, with account statements and other documents which reflected the actual net asset values of the Investor Sub-Accounts and the Trading Sub-Accounts. My preliminary review of documents seized during the Princeton Search confirms that account statements reflecting the acutal net value of the Investor Sub-Accounts were regularly sent from Republic Securities to PEI.

20. I have been informed by attorneys for Republic Securities that they have become aware that at least two Japanese investors received Confirmation Letters that overstated the net asset value of specific Investor Sub-Accounts. Republic Securities Attorney's have advised me that one Japanese investor who purchased a Princeton Note recently provided Republic Bank with a Confirmation Letter dated August 16, 1999. That Confirmation Letter purports to reflect the net asset value of assets in the Investor Sub-Account denominated as Princeton Global Mgmt Ltd. Sub a/c M-3 – PHL/411-21216 ("Sub A/C M-3"). The letter states that as of June 30, 1999, the net asset value of the account was $12,787,123.77. Republic Securities' attorneys have advised me that as of June 30, 1999, and as of August 16, 1999, the net asset value of the account was only approximately $10 million. Moreover, by on or about August 26 or 27, 1999, the account contained approximately $400, the balance of the assets having been transferred at the direction of MARTIN ARMSTRONG to cover losses in the Trading Sub-Accounts.

21. Republic Securities representatives have also discovered correspondence in the offices of the Futures Division of Republic Securities from a Japanese investor which reveals that the investor received a copy of a March 31, 1998, Confirmation Letter. That Confirmation Letter purports to confirm that as of March 31, 1998, the net asset value of the Investor Sub-Account denominated as "Princeton Global Mgmt K-3 Ltd -PHL/411-45060" was $5,781,001.32. The review by the internal auditors revealed, however, that the actual net asset value in that account on that date was only $4,138,140.23, a discrepancy of approximately $1,642,861.09.

<u>Misleading Performance Data</u>

22. I have recently reviewed a website purportedly maintained by Cresvale. A portion of the website discusses various aspects of PEI's services. In a section that appears specifically to be discussing PEI's investment performance with respect to the Princeton Notes issued to Japanese investors, the Website reports that in 1998, PEI obtained a 20.51 percent return on investment. It appears that PEI's claims concerning its performance are false. As noted above, Republic Bank auditors have determined that the Trading Sub-Accounts of the Princeton Global Account have sustained consistent, substantial net losses since at least November 1997.

23. It appears that it was the regular practice of Cresvale to issue to Princeton Note investors monthly statements containing performance data. Republic Bank recently obtained a

monthly valuation statement from a Japanese investor in a Princeton Note. The statement, which I have reviewed, was apparently provided by Cresvale-Tokyo and purports to give performance data for the "Princeton Global Management E Limited" Investor Sub-Account. The monthly statement asserts that in March 1999 the account earned a return of 1.66 percent. I have been advised by attorneys for Republic Bank that auditors hired by Republic Bank have examined the performance of the Trading Sub-Accounts of the Princeton Global Account for March 1999. Their analysis revealed that the Trading Sub-Accounts sustained an overall net loss of approximately $139,529,676 in March 1999.

24. Based upon the foregoing information concerning the misleading Confirmation Letters, the loss exceeding $500,000,000 in the Trading Sub-Accounts, the enormous discrepancy between the substantial amount of Princeton Notes apparently outstanding and the present balance in the Princeton Global Account, the dissemination of false investment performance data relating to the investment of monies received from the sale of the Princeton Notes, and my training and experience in investigating securities and other financial frauds, I have probable cause to believe that MARTIN ARMSTRONG has caused the Confirmation Letters and monthly valuation statements to be distributed to purchasers of the Princeton Notes, and others, to lull investors by concealing the true nature of the financial disposition of their assets and/or to portray the results of PEI's management of the Trading Funds as far more profitable than was the case in order to entice persons to purchase the Princeton Notes.

25. Furthermore, I respectfully submit that there is probable cause to believe that, at least since November 1997, MARTIN ARMSTRONG has fraudulently used monies obtained from more recent Princeton Notes purchasers to pay principal and interest due on older Princeton Notes. As noted above, the FSA has indicated that there are outstanding Princeton Notes with face value of approximately $1 billion, and the PEI employee has stated that, at times, there have been approximately $700 to $800 million outstanding. The PEI employee stated that all principal and interest payments due on the Princeton Notes have been timely paid. In view of the massive trading losses suffered since late 1997, in view of the fact that all of the notes require payment of interest, and in view of the fact that the present balance in the Princeton Global Account is only approximately $46 million, it does not appear that there could have been any source of funds to make all the principal and interest payments as they came due other than from funds raised from new investors.

26. From my review of public records, I have learned that, in or about October 1989, MARTIN ARMSTRONG was sanctioned by the Commodities Futures Trading Commission for violating various provisions of the Commodities Exchange Act by, among other things, conducting a commodity trading advisor business without being registered; failing to deliver proper disclosure documents; failing to maintain proper records; and engaging in false, deceptive, and misleading advertising.

27. From my training and experience, I know that, subject to certain exceptions that do not appear relevant here, persons and firms engaged in the business of managing investment funds or in exercising discretionary trading authority over assets beneficially owned by others, are required by law to be registered as investment advisors with the SEC. From conversations with representatives of the SEC, I have learned that neither MARTIN ARMSTRONG nor PEI are registered as investment advisors with the SEC.

WHEREFORE, deponent prays that a warrant be issued for the arrest of the above-named individual, and that he be arrested and imprisoned or bailed as the case may be.

Anthony L. Zampogna
Special Agent
Federal Bureau of Investigation

Sworn to before me this
13th day of September, 1999

ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK



EXHIBIT 1

1. Contract Parties Chart

**Republic New York Securities**

1618 Spruce Street
Philadelphia, PA 19103
212 525 5950
1 800 680 1932 (US and Canada)
Members of New York Stock Exchange
and all Major Commodities Exchanges

WILLIAM H. ROGERS
President
Futures Division
Telephone 215 731 9090
Fax 215 731 9998

August 16, 1999

Mr. Martin Armstrong
Princeton Economics Institute
214 Carnegie Center Suite 303
Princeton, NJ 08540

Dear Mr. Armstrong,

The Net Asset Value of the following account as of 6/30/99 is as follows:

Princeton Global Mgmt Ltd. Sub a/c M-3 – PHL/411-21216

Total       $12,787,123.27

The above funds are held in AAA US Government Securities

If you have any questions, please do not hesitate to call.

Regards,

*[signature]*

William H. Rogers
President – Futures Division

EXHIBIT 2

R005820