## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARTIN A. ARMSTRONG,

Petitioner,

v.

JOSEPH R. GUCCIONE, United States Marshal for the
Southern District of New York, and MARVIN D.
MORRISON, Warden, Metropolitan Correctional
Center,

Respondents.

**Martin A. Armstrong's
Petition For A Writ Of
Habeas Corpus**

**(Hearing Requested)**

## MARTIN A. ARMSTRONG'S PETITION FOR A
## WRIT OF HABEAS CORPUS

Thomas V. Sjoblom, Esq.
Benjamin R. Ogletree, Esq.
CHADBOURNE & PARKE LLP
1200 New Hampshire Ave., N.W.
Suite #300
Washington, D.C. 20036

Attorneys For Petitioner Martin A.
Armstrong

Date: August 23, 2004

## Table of Contents

Page

INTRODUCTION .................................................................................................1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY .........................3

    A.   The Government Commences Parallel Criminal
       And Civil Proceedings ................................................................3

    B.   Installation Of The Receiver And The "MOA" .........................5

    C.   The Turnover Orders.................................................................8

    D.   The January 7, 2000 *Braswell* Hearing....................................9

    E.   The January 14, 2000 Contempt Hearing ...............................10

    F.   The District Court Invokes Its "Inherent Contempt Power" To Continue
       Armstrong's Confinement Indefinitely Beyond Eighteen Months .........11

JURISDICTION ................................................................................................13

    A.   Subject-Matter Jurisdiction....................................................13

    B.   Personal Jurisdiction ..............................................................13

ARGUMENT.....................................................................................................14

I.   THE DISTRICT COURT LACKED AUTHORITY TO INCARCERATE
    ARMSTRONG FOR CIVIL CONTEMPT ...........................................14

    A.   Congress Has The Authority To Limit The Criminal And Civil Contempt
       Powers Of The Federal District Courts....................................16

       1.   The Judiciary Act of 1789...........................................17

       2.   The Act of Congress of March 2, 1831........................19

       3.   Further Constraints On The Contempt Power —
          The Clayton And Norris LaGuardia Acts .....................21

    B.   The Critical Constraint—The "Non-Detention Act" Codified At 18 U.S.C.
       § 4001(a) .................................................................................22

       1.   Judicial Interpretation of the Non-Detention Act .........22

       2.   Application of the Non-Detention Act To Armstrong.....25

DCI - 206006.01

Table of Contents

(continued)

| | | | Page |
|---|---|---|---|
| | a. | Armstrong Is A "Detained" American "Citizen" | 25 |
| | b. | Armstrong Is Being Detained "By The United States" | 26 |
| | c. | Armstrong's Detention Is Not Authorized Pursuant To An "Act Of Congress" | 26 |
| C. | | Because The Recalcitrant Witness Statute Governs Armstrong's Confinement, The District Court Has Violated This Statute By Detaining Armstrong For Over Four And A Half Years | 28 |
| | 1. | The Recalcitrant Witness Statute Applies To A Witness In A Court Proceeding | 28 |
| | 2. | The Recalcitrant Witness Statute As Applied To Armstrong | 31 |
| | | a. Section 1826(a) Applies To Non-Grand Jury Proceedings | 35 |
| | | b. Section 1826(a) Applies To "Parties" | 38 |
| | | c. Section 1826(a) Applies To The Corporate Assets Demanded By The District Court's Turnover Orders | 40 |
| | 3. | The Recalcitrant Witness Statute Supplants Inherent Power To Incarcerate Civil Contemnors For Failure To Testify Or To Produce Other Information | 41 |
| | 4. | The District Court Erred By Disregarding The Maximum Limit Of Eighteen Months Confinement For Civil Contempt Established By Congress | 43 |
| D. | | The District Court Had No Authority To Freeze The Defendant Corporations' Assets And Therefore No Authority To Issue The Turnover Orders | 46 |
| II. | | ARMSTRONG'S INCARCERATION VIOLATES HIS RIGHTS UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION | 49 |
| A. | | Armstrong's Incarceration For Civil Contempt Despite His Assertion Of His Fifth Amendment Privilege Was Improper | 49 |



Table of Contents

(continued)

Page

1.   The District Court's Reliance On *Braswell* Was Erroneous .....................50

   a.   *Braswell* Does Not Apply Post-Indictment.................................50

   b.   The District Court Erred in Failing To Recognize That The
        *Braswell* Doctrine Has Been Substantially Undermined By
        *Hubbell*.......................................................................52

   c.   The District Court Erred In Its Application Of *Braswell*............53

        i.    Armstrong Was Not A "Custodian" Of The
              Princeton Entities.................................................54

        ii.   *Braswell* Does Not Authorize Compelled Testimony
              Of The Custodian...................................................59

        iii.  *Braswell* Does Not Apply To Personal As Opposed To
              Corporate Records ................................................63

        iv.   The Fifth Amendment Applies To The Corporate
              Records And Assets Covered By The Turnover Orders.........64

2.   Because Armstrong Testified Only To The Extent Required By
     *Rylander*, He Did Not Waive His Fifth Amendment Privilege
     Against Self-Incrimination.............................................................66

B.   Armstrong's Continued Incarceration Violates The Due Process Clause Of
     The Fifth Amendment.....................................................................69

   1.   The District Court's Disregard Of Section 1826(a)'s Eighteen-
        Month Limitation On Confinement For Civil Contempt Violates
        Due Process...............................................................69

   2.   The District Court's Indefinite Confinement Of Armstrong Is A
        Violation Of Due Process ..............................................71

   3.   The District Court's Continuing Incarceration Of Armstrong Is
        Allowing The Government To Manipulate The Civil Enforcement
        Proceeding To Gain An Advantage In The Criminal Proceeding .............72

CONCLUSION....................................................................................75

DCI - 206006.01

## TABLE OF AUTHORITIES

### CASES

*Abm. S. See & Depew v. Fisheries Products, Co.*, 9 F.2d 235 (2d Cir. 1925)..............56

*In re Andrews*, 469 F. Supp. 171 (E.D. Mich. 1979)..............................42, 45, 70

*In re Application of President's Comm'n on Crime*, 763 F.2d 1191 (11th Cir. 1985)..............36

*Bank of Bethel v. Pahquioque Bank*, 81 U.S. 383 (1871)..............................56

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988)..............................31

*Boyd v. United States*, 116 U.S. 616 (1886)..............................38, 64

*Braswell v. United States*, 487 U.S. 99 (1988)..............................passim

*CFTC v. FITC, Inc.*, 52 B.R. 935 (N.D. Cal. 1985)..............................56

*Chambers, v. NASCO, Inc.*, 501 U.S. 32 (1991)..............................31, 41

*Christensen v. Harris County*, 529 U.S. 576 (2000)..............................31

*Committee for Consideration of Jones Falls Sewage Sys. v. Train*,
    539 F.2d 1006 (4th Cir. 1976)..............................30

*Continental Cas. Co. v. United States*, 314 U.S. 527 (1942)..............................30

*Counselman v. Hitchcock*, 142 U.S. 547 (1892)..............................49

*In re Cueto*, 443 F. Supp. 857 (S.D.N.Y. 1978)..............................29, 71

*Curcio v. United States*, 354 U.S. 118 (1957)..............................59, 60, 63, 67

*District of Columbia v. Clawans*, 300 U.S. 617 (1937)..............................71

*Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106 (2d Cir. 1987)..............................37

*Eilenbecker v. District Court of Plymouth County*, 134 U.S. 31 (1890)..............................20, 21

*English v. Bowles*, No. 3:03-C 2003 WL 21955865 (N.D. Tex. Aug. 14, 2003)..............................13

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)..............................35

*Faretta v. California*, 422 U.S. 806..............................51

*First Sav. & Loan Ass'n v. First Fed. Sav. & Loan*, 531 F. Supp. 251
    (D. Haw. 1981)..............................57

iv



*In re Ford*, 615 F. Supp. 259 (S.D.N.Y. 1985) ............................................................45

*Fornos-Lopez v. Figarella Lopez*, 929 F.2d 20 (1st Cir. 1991) (per curiam) ...................13

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ...................................................................69

*In re Grand Jury Investigation (Joseph Braun)*,
    600 F.2d 420 (3d Cir. 1979) .............................................................29, 43, 44, 70

*In re Grand Jury Proceedings*, 486 F.2d 85 (3rd Cir. 1973) ........................................36

*In re Grand Jury Subpoenas Duces Tecum dated June 13, 1983 and June 22, 1983 ("Saxon
    Industries")*, 722 F.2d 981 (2d Cir. 1983) ..........................................................59

*Graselli Chemical Co. v. Aetna Explosives Co.*, 252 F. 456 (2d Cir. 1918) .....................56

*Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ....................................................................................47, 48

*Hamdi v. Rumsfeld*, 124 S. Ct. 2633 (2004) ...........................................................24, 71

*Hamdi v. Rumsfeld*, 337 F.3d 335 (4th Cir. 2003), *rev'd and remanded*,
    124 S. Ct. 2633 (2004) ....................................................................................24

*Hoffman v. United States*, 341 U.S. 479 (1951) ........................................................65

*Hovey v. Elliott*, 167 U.S. 409 (1897) ......................................................................72

*Howe v. Smith*, 452 U.S. 473 (1981) ............................................................23, 26, 28

*ICC v. Brimson*, 154 U.S. 447 (1894) ......................................................................31

*In re Jean-Baptiste*, No. M 11-188 (PKL), 1985 WL 1863 (S.D.N.Y. Jul. 5, 1985) ...........45

*Johnson v. Avery*, 382 F.2d 353 (6th Cir. 1967) ........................................................26

*Kastigar v. United States*, 406 U.S. 441 (1972) .........................................................49

*Ex parte Kearney*, 20 U.S. 38 (1822) .......................................................................18

*In re Kitchen*, 706 F.2d 1266 (2d Cir. 1983) ............................................................29

*Lefkowitz v. Turley*, 414 U.S. 70 (1973) ...................................................................49

*Lono v. Fenton*, 581 F.2d 645 (7th Cir. 1978) (en banc) ...........................................23

*Malone v. Voges Mfg. Co.*, 271 F.2d 230 (2d Cir. 1959) .............................................56

*Manhattan Rubber Mfg. Co. v. Lucey Mfg. Co.*, 5 F.2d 39 (2d Cir. 1925) .......................56

DC1 - 206574.01

*Martin-Trigona v. Belford*, 732 F.2d 170 (2d Cir. 1984) ........................................... 36, 39

*Melickian v. United States*, 547 F.2d 416 (8th Cir. 1977) ........................................ 30, 36

*Michaelson v. United States ex rel. Chicago*, 266 U.S. 42 (1924) ........................... 31

*Miller v. French*, 530 U.S. 327 (2000) ...................................................................... 45

*Natural Gas Pipeline Co. of Am. v. Fritz*, 853 F. Supp. 236
    (S.D. Tex. 1994) ................................................................................................... 36, 37

*In re Neal*, 475 A.2d 390 (D.C. App. 1984) ............................................................. 37

*New Jersey v. New York*, 283 U.S. 336 (1931) ......................................................... 30

*Ohio v. Reiner*, 532 U.S. 17 (2001) (per curiam) .................................................... 49, 68

*Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564 (S.D.N.Y. 2002),
    *rev'd on other grounds*, 124 S. Ct. 2711 (2004) ........................................... 23

*Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003),
    *rev'd on other grounds* 124 S. Ct. 2711 (2004) ............................................ passim

*Palmer v. United States*, 530 F.2d 787 (8th Cir. 1976) ...................................... 30, 36, 41

*Parham v. J.R.*, 442 U.S. 584 (1979) ......................................................................... 69

*Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Services*,
    No. 01 Civ. 2691 (RO), 2001 WL 637387 (S.D.N.Y. June 8, 2001) ............. 38

*Quillar v. United States*, 272 F. Supp. 55 (W.D. Mo. 1967) ................................ 26

*Ex parte Robinson*, 86 U.S. 505 (1873) ............................................... 17, 18, 19, 20, 31

*SEC v. HealthSouth Corp.*, 261 F. Supp. 2d 1298 (N.D. Ala. 2003) ................... 72

*SEC v. Spence & Green*, 612 F.2d 896 (5th Cir. 1980),
    *cert. denied*, 449 U.S. 1082 (1980) .................................................................. 57

*In re Savin*, 131 U.S. 267 (1889) ............................................................................... 20

*Shillitani v. United States*, 384 U.S. 364 (1966) .................................................... 41, 42

*Sigety v. Abrams*, 632 F.2d 969 (2d Cir. 1980) ...................................................... 41, 42

*Sterling Nat'l Bank v. A-1 Holdings Int'l, Inc.*, 175 F. Supp. 2d 573
    (S.D.N.Y. 2001) ................................................................................................... 72

*(Suppressed) v. (Suppressed)*, 109 F. Supp. 2d 902 (N.D. Ill. 2000) ................ 65

DC1-206574.01

*Tavarex v. Attorney Gen.*, 668 F.2d 805 (5th Cir. 1982) .................................................................26

*In re Terry*, 128 U.S. 289 (1888) ..............................................................................18, 19, 20

*Texas v. Pankey*, 441 F.2d 236 (10th Cir. 1971) ........................................................................30

*In re Three Grand Jury Subpoenas*, 191 F.3d 173 (2d Cir. 1999) ...............................50, 57, 58, 65

*United States ex rel. Thom v. Jenkins*, 760 F.2d 736 (7th Cir. 1985) ..................................38

*United States v. Cassese*, 622 F.3d 26 (2d Cir. 1979) ..............................................................35

*United States v. Castro*, 129 F.3d 226 (1st Cir. 1997) .............................................................35

*United States v. Daisart Sportswear, Inc.*, 169 F.2d 856 (2d Cir. 1948) ..............................68

*United States v. Doss*, 563 F.2d 265 (6th Cir. 1977) (en banc) ......................................51, 68

*United States v. Edgerton*, 734 F.2d 913 (2d Cir. 1984) .................................................61, 62, 63

*United States v. Hubbell*, 530 U.S. 27 (2000) ...................................................................*passim*

*United States v. Hutcheson*, 369 U.S. 599 (1962) ....................................................................69

*United States v. Kordel*, 397 U.S. 1 (1970) ..............................................................................64

*United States v. Lawn*, 115 F. Supp. 674 (S.D.N.Y. 1953),
     aff'd, 355 U.S. 339 (1958) ................................................................................................68

*United States v. Matta-Ballesteros*,
     71 F.3d 754 (9th Cir. 1995) ..............................................................................................26

*United States v. Mitchell*, 556 F.2d 371 (6th Cir. 1977) ..............................................27, 39, 43

*United States v. Payner*, 447 U.S. 727 (1980) ..........................................................................31

*United States v. Perkins*, 138 F.3d 421 (D.C. Cir. 1998) ..........................................................34

*United States v. Rylander*, 460 U.S. 752 (1983) .............................................61, 62, 66, 67, 68

*United States v. Saline Bank*, 1 Pet. 100 ....................................................................................69

*United States v. Sanchez*, 725 F.2d 29 (2d Cir. 1984) ........................................................43, 44

*United States v. United Mine Workers of Am.*, 330 U.S. 258 (1947) ........................................22

*Ex parte Wall*, 107 U.S. 265 (1882) ...........................................................................................18

*In re Younger*, 986 F.2d 1376 (11th Cir. 1993) ........................................................................36

DC1 - 206574.01

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................................13, 69, 71

## RELATED CASES

*CFTC v. Armstrong*, 284 F.3d 404 (2d Cir. 2002) ...................................................................12

*CFTC v. Armstrong*, 269 F.3d 109 (2d Cir. 2001) ...................................................................12

*SEC v. Armstrong*, Nos. 03-6080(L), 03-6084, 2004 WL 362318
   (2d Cir. Feb. 26, 2004) ...................................................................12

*SEC v. Princeton Econ. Int'L, Ltd.*,
   Docket Nos. 00-6076, 00-6156, 2001 WL 300550 (2d Cir. Mar. 27, 2001) ...................11

*SEC v. Princeton Econ. Int'l, Ltd.*, 294 F. Supp. 2d 550 (S.D.N.Y. 2003) ...................64

*SEC v. Princeton Econ. Int'l, Ltd.*, 199 F. Supp. 2d 113 (S.D.N.Y. 2002) ...................6, 7

*SEC v. Princeton Econ. Int'l, Ltd.*, 152 F. Supp. 2d 456 (S.D.N.Y. 2001) ...................*passim*

*SEC v. Princeton Econ. Int'l, Ltd.*, 84 F. Supp. 2d 443 (S.D.N.Y. 2000) ...................73

*SEC v. Princeton Econ. Int'l, Ltd.*,
   No. 99 Civ. 9667 (RO), 2000 WL 193131 (S.D.N.Y. Feb. 17, 2000) ...................72

## CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

U.S. Const, art. I, § 8 ...................................................................14, 16

U.S. Const, art. III, § 2 ...................................................................16

Act of Congress of March 2, 1831, 4 Stat. 487 ...................................................................15, 19, 20, 21

Clayton Act of 1914, 38 Stat. 730 ...................................................................15, 21, 22

Congress's Authorization for Use of Military Force Joint Resolution,
   Pub. L. No. 107-40, 115 Stat. 224 (2001) ...................................................................24

Judiciary Act of 1789, 1 Stat. 73 ...................................................................15, 17, 18

Norris LaGuardia Act, 47 Stat. 90 ...................................................................15, 22

7 U.S.C. § 13a-1(a) ...................................................................48

15 U.S.C. §§ 77t(b) ...................................................................48

15 U.S.C. § 78u(d)(1) ...................................................................48

18 U.S.C. § 401 ...................................................................15, 35

viii

18 U.S.C. § 981 ................................................................................................4

18 U.S.C. § 3481 ..............................................................................................68

18 U.S.C. § 4001(a) ................................................................................... passim

18 U.S.C. § 4001(b) ..........................................................................................26

18 U.S.C. §§ 6001 .............................................................................................35

18 U.S.C. §§ 6002 .......................................................................................35, 51

28 U.S.C. § 561(a) ............................................................................................26

28 U.S.C. § 1331 ..............................................................................................13

28 U.S.C. § 1826(a) .................................................................................... passim

28 U.S.C. §§ 2241 .............................................................................1, 3, 12, 13

28 U.S.C. § 2242 ..............................................................................................14

Fed. R. Crim. P. 15(d) ......................................................................................34

Fed. R. Crim. P. 42(a) ......................................................................................37

## OTHER AUTHORITIES

115 Cong. Rec. 5879 (1969) .......................................................................29, 35

116 Cong. Rec. 35291 (Oct. 7, 1970) .................................................................29

116 Cong. Rec. 35192 (Oct. 7, 1970) .................................................................70

H.R. Rep. No. 91-1549, 91 Cong., 2d Sess. 46 (Sept. 30, 1970),
    reprinted in 1970 U.S.C.C.A.N. 4007 ..............................................29, 36, 40

H.R. Rep. No 92-116, 92 Cong., 1st Sess. (Apr. 6, 1971),
    1971 U.S.C.C.A.N. 1435 ...........................................................................23

Felix Frankfurter & James M. Landis, Power of Congress Over Procedure in Criminal
    Contempts in "Inferior" Federal Courts —A Study in the Separation of Powers,
    37 Harv. L. Rev. 1010, 1012 (1923-24) ......................................................14

Joseph Story, Commentaries on the Constitution of the United States, § 1768, Vol. III (1833)...16

Stephen I. Vladeck, Note, The Detention Power, 22 Yale L. & Pol'y Rev. 153
    (Winter 2004) ..........................................................................................28

DC1 - 206574.01

Petitioner Martin A. Armstrong ("Armstrong"), by and through his undersigned counsel, respectfully submits this Petition For A Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2241

## INTRODUCTION

On January 14, 2000, Armstrong was adjudged in civil contempt by the Honorable Richard Owen of the United States District Court for the Southern District of New York ("District Court") for his purported non-compliance with two previously-issued "turnover orders" directing him to produce certain items in connection with a civil enforcement proceeding brought against him by the U.S. Securities and Exchange Commission ("SEC") and the U.S. Commodity Futures Trading Commission ("CFTC"). The same day, the District Court ordered Armstrong to be incarcerated at the Metropolitan Correctional Center ("MCC") in New York City for a period not to exceed eighteen months, in accordance with the Recalcitrant Witness Statute, 28 U.S.C. § 1826(a), but later disregarded the statutory eighteen-month restriction and invoked its "inherent contempt power" to continue Armstrong's confinement indefinitely.

More than *four and a half years later*, Armstrong remains incarcerated for civil contempt at the MCC and now respectfully petitions this Court to grant a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on the ground that his custody is in violation of the Constitution and the laws of the United States in several critical respects:

*First*, the District Court, in relying upon its "inherent power" to incarcerate Armstrong for contempt for over four and a half years, vastly exceeded its authority under Article III of the Constitution. As a threshold matter, Congress, by enacting the Non-

Detention Act, 18 U.S.C. § 4001(a), delimited a District Court's use of its inherent civil contempt authority to matters other than incarceration. Congress has commanded in Section 4001(a), and the District Court must honor the command, that no citizen shall be imprisoned or otherwise detained without statutory authority conferred by an "Act of Congress." The District Court's express reliance on its inherent contempt power as the sole basis to confine Armstrong conclusively establishes that the confinement is unlawful because the exercise of judicial inherent contempt power is not an "Act of Congress" that Section 4001(a) requires.

*Second*, Armstrong's fifty-five (and counting) months of confinement is also indisputably unlawful under the Recalcitrant Witness Statute, 28 U.S.C. § 1826(a), which constrains the District Court's inherent authority to confine a civil contemnor for more than eighteen months under the circumstances of this case. Because Armstrong not only was ordered to produce but also to testify as to why he did not produce missing items demanded by the turnover orders, he is entitled to the protection against indefinite confinement conferred upon him by the Recalcitrant Witness Statute.

*Third*, insofar as Armstrong is confined for failing to comply with the District Court's orders to produce and testify about the location of demanded materials directly related to the subject matter of a parallel criminal indictment pending against him—despite his timely assertion of the Fifth Amendment privilege—Armstrong's incarceration violates the self-incrimination protections and the Due Process Clause of the Fifth Amendment of the Constitution. Moreover, the District Court's continuing incarceration of Armstrong is allowing the Government to use the civil contempt as a weapon with which to improperly

2

manipulate the civil enforcement proceedings to prejudice Armstrong's rights and to obtain an unfair tactical advantage in the prosecution of the parallel criminal proceeding.

The Court should cure these constitutional infirmities by granting Armstrong's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This proceeding arises out of an allegedly fraudulent scheme in which Armstrong and others marketed and sold promissory notes ("Princeton Notes") to Japanese institutional investors in Japan. Among other accusations of wrongdoing, Armstrong purportedly failed to honor representations made to investors to segregate and keep whole each of their respective investments in separate accounts at Republic New York Securities Corporation ("Republic") in the names of Princeton Economics International, Ltd. ("PEI") and Princeton Global Management, Ltd. ("PGM") (collectively, "Princeton Entities" or "Corporate Defendants"), companies incorporated under the laws of the Turks and Caicos Islands, British West Indies, that Armstrong allegedly controlled. (*See* Exhibit 1, hereto.) According to the Government's theory, investor monies raised from the sale of Princeton Notes were improperly commingled and, to conceal mounting trading losses in the Princeton accounts, funds received from newly-issued notes were used to repay older notes as they came due.

### A.    *Government Commences Parallel Criminal And Civil Proceedings*

On September 1, 1999, agents of the Federal Bureau of Investigation, armed with a search warrant obtained by the United States Attorney's Office for the Southern District of New York, raided the offices of PEI and served grand jury subpoenas on the company's

employees. (*See* Ex. 1, at 2 n.1.) The next day, the United States Attorney's Office obtained and executed a seizure warrant pursuant 18 U.S.C. § 981, seizing all funds and assets held in the Princeton accounts at Republic and all proceeds traceable thereto. (*See* Exhibit 2, hereto.)

On September 13, 1999, the United States Government formally launched a coordinated, multi-pronged offensive against Armstrong. That morning, the United States Attorney's Office's filed a one-count sealed criminal complaint charging him with securities fraud and obtained a warrant for his arrest. (*See* Ex. 1, at 1.) Armstrong surrendered voluntarily to authorities that afternoon in Trenton, New Jersey after learning about the criminal complaint. (*See* Exhibit 3, hereto.) On September 29, 1999, a federal grand jury in the Southern District of New York returned a fourteen count indictment against Armstrong stemming from the alleged fraud ("First Indictment"). (*See* Exhibit 4, hereto.) Among other averments, paragraph six the First Indictment alleged that "from about 1996 to in or about 1999, Armstrong spent millions of dollars obtained from the sale of Princeton Notes to purchase rare coins and antiquities." (*Id.* ¶ 6, at 3.)

If the SEC and CFTC truly had harbored concerns that Armstrong or others might somehow, despite the United States Attorney's seizure of the Princeton accounts, dissipate or abscond with funds or assets belonging to the Princeton Entities, one would have expected the perceived exigency to have caused the agencies to take swift action after the Government's probe on September 1. But that did not happen, however. To the contrary, the SEC and CFTC took no action for twelve days, until September 13, 1999, so that they could coordinate their blitzkrieg with the United States Attorney's Office. Late that afternoon, attorneys for the SEC and CFTC -- who conveniently waited until Armstrong had surrendered

authorities in Trenton, New Jersey to ensure that he was out of the picture -- made a mad dash to the Federal District Courthouse in the Southern District of New York where they commenced parallel civil enforcement actions, charging Armstrong and the Corporate Defendants with violations of the federal securities and commodities laws, and obtained an "emergency" temporary restraining order ("TRO") freezing the Defendants' assets, installing a temporary equity receiver ("Receiver") for the Princeton Entities, and granting other interim relief.[1] (*See* Exhibits 5, 6 & 7, hereto.)

As the Government itself has acknowledged, the alleged conduct and factual issues underlying the charges against Armstrong in the criminal and civil actions are precisely the same. (*See* Exhibit 8, at 4 lines 5-6, hereto (stating in open court on October 15, 1999 that the parallel civil enforcement action, in relation to the criminal proceeding pending against Armstrong, "is the same case, essentially, only in a civil context." (statement of AUSA Brian Coad); *see also* Exhibit 9, at 2, hereto (3/8/04 Letter from CFTC counsel Lisa A. Rosenthal to Honorable Richard Owen at 2 ("The criminal charges and the civil complaint are predicated on the same alleged conduct, involving the same issues of fact."))).

**B.    Installation Of The Receiver And The "MOA"**

The appointment of an equity Receiver was the next critical step in the Government's plan to manipulate these parallel proceedings, both of which it controls, to prejudice Armstrong's rights and to obtain strategic advantages in the criminal case. To that end, the SEC and CFTC on September 13, 1999 sought and obtained the immediate

---

[1] The civil suits were assigned to Judge Richard Owen who was unavailable to consider the agencies' "emergency" application for a TRO on September 13. In Judge Owen's absence, the matter was heard by Judge Lewis A. Kaplan. (*See* Ex. 7, at 1.)

installation of a Receiver over the Corporate Defendants without ever serving the Corporate

Defendants with process in a manner prescribed by Rule 4 of the Federal Rules of Civil

Procedure, a necessary predicate to the District Court's exercise of personal jurisdiction over

them.[2] (See Exhibit 10, § X, at 9, hereto.)

On September 19, 1999, the Supreme Court, Providenciales, in the Turks and

Caicos Islands, appointed Joint Provisional Liquidators ("JPLs") over the Princeton Entities.

On October 7, 1999, the Receiver and the JPLs entered into a Memorandum of Agreement

("MOA") that established the manner in which the two groups, using funds belonging to the

Corporate Defendants, were to conduct their duties to identify, recover, preserve and protect

any recovered assets belonging to the Princeton Entities or Armstrong, and to maximize the

recoveries of anticipated creditors in respect thereof, including any recovery from Armstrong

personally. (See Exhibit 11 ¶¶ 1-5, hereto; see also SEC v. Princeton Econ. Int'l, Ltd., 199 F.

Supp. 2d 113, 116. (S.D.N.Y. 2002)). Importantly, paragraph 16 of the MOA expressly

provided that the JPLs and the Receiver were to function as agents of, inter alia, the United

States Attorney's Office to aid in its collection of evidence and information to be used in the

criminal prosecution of Armstrong:

---

[2] The docket sheets in the SEC case (cv-9667) and the CFTC case (cv-9669), and the underlying affidavits of service referenced therein, indicate that the SEC and CFTC purported to effect service at the September 13, 1999 TRO hearing by handing an Order To Show Cause to an attorney of the New York law office of Blank Rome Tenzer & Greenblatt, LLP ("Tenzer Greenblatt"), who then served as counsel to Armstrong, in his individual capacity, only. We as counsel for Armstrong recently contacted attorneys formerly of the Tenzer Greenblatt firm, including Martin P. Unger, who headed up the firm's representation of Armstrong in the civil case. Mr. Unger and the other lawyers we contacted confirmed that Tenzer Greenblatt's representation was limited to Armstrong and no one else. The service therefore was invalid.

Moreover, in a January 6, 2000 Amended Order, the District Court purportedly expanded the scope of the receivership by granting the Receiver exclusive control over the management and assets of 460 foreign corporate subsidiaries and affiliates of the Princeton Entities. (See Exhibit 12, hereto.) Nothing in the record

(Cont'd on following page)

To the extent such actions would not violate any duties of the JPLs or the Receiver, respectively, under applicable law, (A) the JPLs and the Receiver *shall* each take all reasonable steps to cooperate with the CFTC, the SEC and *the USAO*, in connection with their *investigation and prosecution* of civil, administrative and *criminal matters relating to Martin A. Armstrong*, [the Princeton Entities] and any of their subsidiaries, affiliates, officers, directors or employees, and (B) the JPLs and the Receiver *shall* endeavor to provide the CFTC, the SEC and *the USAO* with reasonable access to books and records within their possession, custody or control, to the extent permitted by law, wherever situated, whether within the United States or outside the United States.

(*Id.* ¶ 16, at 6 (emphasis added)). Remarkably, however, in paragraph 13(b) of the MOA, the Receiver and the JPLs pledged *not* to provide Armstrong with any evidence they gathered against him. (*See id.* ¶ 13(b) at 5-6.)

As part of an October 14, 1999 preliminary injunction order, the District Court approved the MOA. (*See* Exhibit 13, ¶¶ III-VI, at 4-6, hereto.) At that time, however, a copy of the MOA was not furnished to Armstrong who first learned of its existence only well after the events leading up to his confinement for civil contempt.[3]

On October 14, 1999, even though the Corporate Defendants never had been served with process or appeared in the case, the Receiver consented to the entry of a preliminary injunction on behalf of their that resolved the SEC's claims against them.

---

(Cont'd from preceding page)

indicates, however, that any of these subsidiaries and affiliates ever were served with process to bring them within the jurisdiction of the District Court.

[3] In an April 22, 2002 opinion, the District Court assumed that the MOA was served on Armstrong's counsel, Mr. Unger, at the October 14, 1999 preliminary injunction hearing and that Mr. Unger in turn provided a copy to Armstrong. *See Princeton Econ. Int'l, Ltd.*, 199 F. Supp. 2d at 117 ("Mr. Unger was thereupon furnished with a copy of the MOA and one would assume he showed it to his client, Mr. Armstrong . . ."). These assumptions are unsupported by the record, however.

DCI - 206006.01

Having seized the Corporate Defendants over which the District Court lacked the requisite personal jurisdiction to install a receivership in the first place, the Receiver together with the JPLs set out to use the civil suit as a vehicle in which to conduct a *de facto* criminal investigation of Armstrong -- an *indicted* criminal defendant -- on behalf of the United States Attorney.

### C.    The Turnover Orders

The next stage in the Government's coordinated manipulation of these parallel proceedings was the issuance and enforcement of turnover orders. As part of the September 13, 1999 TRO and in the subsequent October 14, 1999 preliminary injunction order ("Turnover Orders"), the District Court commanded Armstrong to produce to the Receiver certain property belonging to the Corporate Defendants that Armstrong purportedly had purchased with funds drawn from the Princeton accounts at Republic. At a court-ordered deposition on December 1, 1999, Armstrong asserted his Fifth Amendment privilege against self-incrimination in response to questions regarding corporate property identified by the Turnover Orders that fell squarely within the subject-matter identified at paragraph six of the First Indictment pending against him. (*See* Exhibit 14, ¶ 15, at 4, hereto.)

A superceding indictment returned against Armstrong in July 2004 ("Second Indictment") makes even more explicit that which was plainly implied by the allegations in paragraph six of the First Indictment -- namely, that the property sought by the Turnover Orders goes to the very heart of the Government's allegations of Armstrong's criminal conduct. (*See* Exhibit 15, hereto.) Paragraphs 13(c) and 70(h) of the Second Indictment specifically refer to Armstrong's acquisition and possession of the corporate property as not only acts of the underling fraud but also as fruits of Armstrong's purportedly criminal conduct

that provided him a motive to engage in the alleged fraud. (*See id.* ¶¶ 13(c), 70(h).) Likewise, paragraphs 61 and 63 of the Second Indictment alleges that a computer and a computer hard drive that Armstrong did not produce to the Receiver (because Armstrong insisted that he did not have them) contained information that was "amongst the *most incriminating* [evidence against Armstrong], and which clearly reflected his fraudulent activity." (*Id.* ¶ 61 (emphasis added)). Finally, the civil contempt also forms the basis for the Government's request for a sentencing enhancement under the United States Sentencing Guidelines due to Armstrong's alleged obstruction of justice in failing to comply with the Turnover Orders. (*See id.* ¶¶ 62-63, 83.)

In sum, the Receiver was not functioning merely as an officer of the District Court engaged in the ministerial task of marshalling corporate property as part of the orderly administration of the receivership's estate. Rather, the Receiver was actively pursuing its mission as an agent of the Government to use the Turnover Orders to compel Armstrong to produce incriminating evidence to be used by the Government to bolster its pending criminal prosecution of him.

## D.  The January 7, 2000 *Braswell* Hearing

At a January 7, 2000 hearing, even though Armstrong had been indicted almost four months earlier, the District Court rejected his assertion of the Fifth Amendment privilege on the ground that under *Braswell v. United States*, 487 U.S. 99 (1988), Armstrong was a "corporate custodian" of the Princeton Entities to whom the Fifth Amendment privilege is unavailable. (*See* Exhibit 16, at 97-98, 100, hereto.) The District Court thus ordered Armstrong to produce the records and assets sought by the Turnover Orders and warned him that asserting the Fifth Amendment privilege — even post-indictment -- was not an option

available to him with respect to any demanded items he did not produce. The District Court

stated:

> I am observing now to Mr. Armstrong and his lawyers that if there
> is nonproduction of any of the items that have been listed by the
> court as having been demonstrated to be produced by him, *if there
> is any nonproduction, I'm going to want a competent explanation.
> I don't want a Fifth Amendment explanation. I don't want a rank
> hearsay explanation.*

(*Id.* at 103-04 (emphasis added)).

**E.**        **The January 14, 2000 Contempt Hearing**

Between January 7, 2000 and January 14, 2000, Armstrong gave the Receiver

items that were within his possession and control but could not turn over other demanded

items that he did not have (*e.g.*, rare coins, gold bars, antiquities, a computer and a computer

hard drive). At a January 14, 2000 hearing on a motion by the Receiver to hold Armstrong in

contempt (the "First Contempt Hearing"), Armstrong, as commanded by the District Court at

the January 7, 2000 *Braswell* hearing, was forced to testify at length regarding the disposition

and/or unknown whereabouts of demanded corporate records and assets that he did not

produce in his purported capacity as a corporate custodian. (*See* Exhibit 17, at 99 *et seq.*,

hereto.) The District Court expressed dissatisfaction with Armstrong's efforts to comply with

the Turnover Orders and his failure to explain to the Court's satisfaction the location of the

missing property. (*See id.* at 196-201.) The District Court thus summarily held Armstrong in

contempt of court and ordered that he be incarcerated at the MCC until he either complies

with the Turnover Orders or provides further testimony demonstrating his inability to do so

("First Contempt Order"). (*See id.* at 199, lines 13-21.) The District Court prepared a

handwritten detention order remanding Armstrong to the custody of the United States

10

Marshals Service which stated that "Martin Armstrong [is to] be confined in the [MCC] in civil contempt as per the minutes of the hearing of this date. The U.S. Marshals are directed to effect this." (Exhibit 18, hereto.)

The District Court stated on January 14, 1999, and specifically noted in an August 25, 2000 contempt order ("August 25, 2000 Order"), that Armstrong's confinement "at this point has an outside limit of eighteen months," implicitly referring to the maximum time allowable for incarceration for civil contempt under the Recalcitrant Witness Statute, 28 U.S.C. § 1826(a). (See Exhibit 19, ¶¶ III, VI, at 6-7, 8, hereto.) Armstrong appealed the First Contempt Order but the United States Court of Appeals for the Second Circuit dismissed it as an interlocutory appeal over which it lacked jurisdiction.[4] See SEC v. Princeton Econ. Int'l, Ltd., Nos. 00-6076, 00-6156, 2001 WL 300550, *1 (2d Cir. Mar. 27, 2001).

### F.    The District Court Invokes Its "Inherent Contempt Power" To Continue Armstrong's Confinement Indefinitely Beyond Eighteen Months

On July 6, 2001, shortly before the scheduled July 14, 2001 expiration of Armstrong's initial eighteen months of confinement, the District Court convened a hearing ("Second Contempt Hearing") at which it extended Armstrong's contempt *indefinitely* because he had not complied with the Turnover Orders (the "Second Contempt Order"). (See Exhibit 20, at 25, 34-35, hereto.) In a July 17, 2001 opinion supplementing its verbal findings and order of July 6, 2001, the District Court changed its position on the basis for Armstrong's

---

[4] The District Court's reference to an eighteen-month limitation on Armstrong's confinement as articulated in its First Contempt Order was noted by the Second Circuit as well. See SEC v. Princeton Econ. Int'l, Ltd., Docket Nos. 00-6076, 00-6156, 2001 WL 300550, at *1 (2d Cir. Mar. 27, 2001) (observing that the District Court on January 14, 2000 ordered Armstrong confined for civil contempt to last "in no event for longer than 18 months").

11

incarceration, insisting that Armstrong's confinement for civil contempt always had been predicated on its "general and inherent equitable power" and that the District Court's prior statement at the First Contempt Hearing on January 14, 2000 that Armstrong's confinement had an outside limit of eighteen months was "unintentional." *SEC v. Princeton Econ. Int'l, Ltd.,* 152 F. Supp. 2d 456, 458 n.2 (S.D.N.Y. 2001). Armstrong appealed the Second Contempt Order but the Second Circuit again dismissed it for lack of appellate jurisdiction. *See CFTC v. Armstrong,* 269 F.3d 109 (2d Cir. 2001) (motions panel); *CFTC v. Armstrong,* 284 F.3d 404, 407 (2d Cir. 2002) (per curiam).

When Armstrong's confinement reached the expiration of the second eighteen-month period of his incarceration for civil contempt, the District Court on January 23, 2003 ("Third Contempt Hearing") again relied on its inherent contempt power to order Armstrong's confinement to continue indefinitely (the "Third Contempt Order"). (*See* Exhibit 21, at 35-36, hereto.)    In a February 26, 2004 Summary Order, the Second Circuit dismissed Armstrong's appeal from the Third Contempt Order for lack of appellate jurisdiction. *See SEC v. Armstrong,* Nos. 03-6080(L), 03-6084, 2004 WL 362318 (2d Cir. Feb. 26, 2004). This time, however, the Second Circuit specifically noted that the dismissal was without prejudice to any habeas corpus remedy available to Armstrong under 28 U.S.C. §§ 2241 or 2255, pointing out that "a ruling squarely addressing the merits of Armstrong's arguments will streamline the ultimate resolution of the case." *Id.* at *2.

This petition for habeas corpus followed.

## JURISDICTION

### A.    Subject-Matter Jurisdiction

Federal district courts have subject-matter jurisdiction over habeas corpus proceedings. *See* Art. III, §§ 1 & 2. U.S. Const. Section 1331 of Title 28 of the United States Code confers "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Section 2241 of Title 28 specifically confers such jurisdiction upon this Court to consider Armstrong's application for a writ of habeas corpus. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). Jailed for civil contempt, it is beyond cavil that Armstrong is "in custody" for purposes of invoking federal habeas jurisdiction. *See Armstrong*, 2004 WL 362318, at *2 (noting that there is "no reason to foreclose the availability of collateral relief to an individual who is incarcerated pursuant to a federal civil contempt order"); *Fornos-Lopez v. Figarella Lopez*, 929 F.2d 20, 23 (1st Cir. 1991) (per curiam) ("[A] person incarcerated for civil contempt . . . is obviously in 'custody,' in the traditional sense, for the purposes of invoking habeas jurisdiction."); *English v. Bowles*, No. 3:03-CV-0786-K, 2003 WL 21955865, at *1 n.1 (N.D. Tex. Aug. 14, 2003) (citing *Fornos-Lopez* and decisions by other circuit courts as authority for the rule that "[a] person incarcerated for civil contempt is 'in custody' for purposes of invoking habeas jurisdiction under 28 U.S.C. § 2241.").

### B.    Personal Jurisdiction

Respondents are Joseph R. Guccione, United States Marshal for the Southern District of New York, and Marvin D. Morrison, Warden of the MCC, who currently are detaining Armstrong at the MCC pursuant to the Contempt Orders issued by the District

DC1 - 206006.01

Court.[5]   *See also* 28 U.S.C. § 2242.   Thus, 28 U.S.C. § 1346(a)(2) confers personal jurisdiction over them.   Moreover, this Court has personal jurisdiction over the Respondents because they are physically present within this District and are amenable to service of process here pursuant to Rules 4(e) and 4(i) of the Federal Rules of Civil Procedure.

Pursuant to 28 U.S.C. § 2242, Armstrong requests that this Court issue the writ of habeas corpus directing Respondents to produce Armstrong at the hearing on this petition.

## ARGUMENT

### I.    THE DISTRICT COURT LACKED AUTHORITY TO INCARCERATE ARMSTRONG FOR CIVIL CONTEMPT

Armstrong's continuing incarceration for civil contempt — in direct violation of the Non-Detention Act, 18 U.S.C. § 4001(a), and in contravention of the eighteen-month maximum time limit for such incarceration prescribed by the Recalcitrant Witness Statute, 28 U.S.C. § 1826(a) — raises fundamental constitutional concerns.   The Constitution of the United States empowers the legislature "to constitute Tribunals inferior to the supreme Court."   U.S. Const., art. I, § 8.   Pursuant to this authority, the powers of the lower federal courts are created and limited according to congressional will.   Transgressions of such express legislative limitations violate a fundamental principle of the Constitution — the Separation of Powers.[6]

---

[5] Although the District Court's January 14, 2000 handwritten detention order remanded Armstrong to the custody of the United States Marshals, the Marshals Service is housing him at the MCC under the day-to-day supervision of the Bureau of Prisons.   (*See* Ex. 18.)   Out of an abundance of caution, we have named as custodians for purposes of this habeas petition both the United States Marshal for this district and the warden of the MCC.

[6] Felix Frankfurter & James M. Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts — A Study in the Separation of Powers*, 37 Harv. L. Rev. 1010, 1012 (1923-24) [hereinafter, "Frankfurter"].   Then Professor Frankfurter observed, "At the bottom of our problem [of Congressional authority
(Cont'd on following page)

Court.[5]  *See also* 28 U.S.C. § 2242.  Thus, 28 U.S.C. § 1346(a)(2) confers personal

jurisdiction over them.  Moreover, this Court has personal jurisdiction over the Respondents

because they are physically present within this District and are amenable to service of process

here pursuant to Rules 4(e) and 4(i) of the Federal Rules of Civil Procedure.

 Pursuant to 28 U.S.C. § 2242, Armstrong requests that this Court issue the writ

of habeas corpus directing Respondents to produce Armstrong at the hearing on this petition.

## ARGUMENT

**I.     THE DISTRICT COURT LACKED AUTHORITY TO INCARCERATE
 ARMSTRONG FOR CIVIL CONTEMPT**

 Armstrong's continuing incarceration for civil contempt — in direct violation

of the Non-Detention Act, 18 U.S.C. § 4001(a), and in contravention of the eighteen-month

maximum time limit for such incarceration prescribed by the Recalcitrant Witness Statute, 28

U.S.C. § 1826(a) — raises fundamental constitutional concerns.  The Constitution of the

United States empowers the legislature "to constitute Tribunals inferior to the supreme

Court."  U.S. Const., art. I, § 8.  Pursuant to this authority, the powers of the lower federal

courts are created and limited according to congressional will.  Transgressions of such express

legislative limitations violate a fundamental principle of the Constitution — the Separation of

Powers.[6]

---

[5] Although the District Court's January 14, 2000 handwritten detention order remanded Armstrong to the custody of the United States Marshals, the Marshals Service is housing him at the MCC under the day-to-day supervision of the Bureau of Prisons.  (*See* Ex. 18.)  Out of an abundance of caution, we have named as custodians for purposes of this habeas petition both the United States Marshal for this district and the warden of the MCC.

[6] Felix Frankfurter & James M. Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts — A Study in the Separation of Powers,* 37 Harv. L. Rev. 1010, 1012 (1923-24) [hereinafter, "Frankfurter"].  Then Professor Frankfurter observed, "At the bottom of our problem [of Congressional authority

(Cont'd on following page)

14

When Congress created the lower federal courts with passage of the Judiciary Act of 1789, it vested the federal courts with the power of contempt. However, as then Professor Frankfurter observed, "when judicial abuses of the law of contempt became acute, Congress promptly dealt with them."[7] In the two centuries since the creation of the lower courts, Congress repeatedly has limited the inherent criminal and civil contempt power by defining the specific circumstances in which the lower federal courts are authorized to employ it. For example, by the Act of Congress of March 2, 1831, Congress limited the use of the criminal contempt power to three specific circumstances. Subsequently, Congress enacted the Clayton and Norris LaGuardia Acts, section 401 of Title 18 of the United States Code (criminal contempt), and the Recalcitrant Witness Statute (civil contempt) — each further limiting the use of the contempt power or defining specific instances in which its use is permissible. Significantly, Congress effectively has abolished the inherent contempt power to incarcerate by enacting the Non-Detention Act, 18 U.S.C. § 4001(a), (unequivocally stating that no citizen of the United States shall be detained except pursuant to an Act of Congress).[8]

In incarcerating Armstrong for contempt, the District Court ignored these express congressional limitations. The District Court did not employ the authority granted to it under 18 U.S.C. § 401, which would have provided Armstrong with valuable procedural protections, such as the right to a jury trial. Moreover, when convenient, the District Court here exercised its authority under the Recalcitrant Witness Statute, but after the Court

---

(Cont'd from preceding page)

over criminal contempt power] lies the separation of powers. That doctrine embodies cautions against tyranny in government through undue separations of power." *Id.*

[7] Frankfurter, *supra* note 6, at 1052.

determined that it wished to confine Armstrong beyond the statutory maximum of eighteen months, the District Court through *ipse dixit* relied on its "inherent powers" to do so. The protracted length of Armstrong's detention — now in its fifty-fifth month — is precisely the type of judicial abuse that Congress proscribed in the Recalcitrant Witness Statute. Moreover, the fact that Armstrong is incarcerated *at all* is precisely the type of governmental action prohibited by the Non-Detention Act. Accordingly, Armstrong's confinement is a transgression of congressional will and a violation of the constitutional doctrine of the Separation of Powers.

### A.     Congress Has The Authority To Limit The Criminal And Civil Contempt Powers Of The Federal District Courts

As then Dean Joseph Story wrote in the early 1800s, "the jurisdiction of the courts of the United States is almost wholly under the control of the regulating power of Congress."[9] Admittedly, Dean Story also observed, referring to the inherent judicial powers of the federal courts, "there are certain incidental powers which are supposed to attach to them, in common with all other Courts, when duly organized, without any positive enactment of the legislature." This case is a far cry, however, from what Dean Story contemplated because here the District Court's exercise of its "inherent" contempt power is directly contrary to "positive enactments of the legislature," *i.e.,* Congress.

The following historical synopsis reveals that practically since the time of the founding of the Constitution, Congress has exercised its constitutional power to *limit* the

---

(Cont'd from preceding page)

[8] We do not address herein the inherent power of the federal district courts to hold in contempt persons violating the decorum of the court, *e.g.,* attorneys.

[9]  Joseph Story, *Commentaries on the Constitution of the United States,* § 1768, Vol. III (1833); *see also* U.S. Const., art. I, § 8; *see id.,* art. III, § 2.

DC1 - 206006.01

contempt authority of the lower courts, and the courts have ceded to Congress' legitimate exercise of authority. Thus, contrary to the view of the District Court in this case, no notion of "general" or "inherent" power to incarcerate civil contemnors survives or coexists with the Non-Detention Act, 18 U.S.C. § 4001(a), or the Recalcitrant Witness Statute, 28 U.S.C. § 1826(a).

### 1.    The Judiciary Act of 1789

Analysis of the lower federal district courts' contempt power appropriately begins with the Judiciary Act of 1789, 1 Stat. 73 (Sept. 24, 1789). Section 17 of the Judiciary Act simultaneously created the lower federal courts and vested them with powers of contempt. Section 17 of the Judiciary Act provides in part:

> And it be further enacted, that all the said courts of the United States shall have the power to ... punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same ....[10]

The first Supreme Court case to interpret this provision was *Ex parte Robinson*, 86 U.S. 505 (1873). In *Robinson*, the Court considered the *mandamus* petition of an attorney disbarred under a district court's contempt power. *See id.* at 507-08. The Supreme Court noted that Section 17 of the Judiciary Act "declares that the court shall have power to punish contempts of their authority in any cause or hearing before them, by fine or

---

[10] The only other section of the Judiciary Act relevant to the Turnover Orders here is Section 15. Section 15 provides, in part, that "all the said courts of the United States, shall have power ... to require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue, in cases and under circumstances where they might be compelled to produce the same by the ordinary rules or proceeding in chancery; and if a plaintiff shall fail to comply with such order, to produce books or writings, it shall be lawful for the courts respectively, on motion, to give the like judgment for the defendant as in cases of nonsuit; and if a defendant shall fail to comply with such order, to produce books or writings, it shall be lawful for the courts respectively on said motion as aforesaid, to give judgment against him or her by default." This provision is, inapplicable here because the District Court did not enter a default judgment against Armstrong, but rather, held him in civil contempt of court.

17

imprisonment, at their discretion." *Id.* at 512. The Court reasoned that the lower court could not use its contempt powers to disbar counsel, holding that the "enactment [of the Judiciary Act] is a limitation upon the manner in which the power shall be exercised, and must be held to be a negation of all other modes of punishment." *Id.* Thus, the Court recognized congressional authority to define and limit the contempt powers of the lower federal courts, and held them to strict compliance with such statutory limitations. *See also In re Terry*, 128 U.S. 289, 304 (1888) (distinguishing the nature of contempt power of federal courts from state courts, holding that, with respect to the federal courts, this power "is not simply incidental to their general power to exercise judicial functions; it is expressly recognized, and the cases in which it may be exercised are defined, by acts of Congress").

The possibility of abuse under the broad terms of the Judiciary Act and subsequent contempt statutes was recognized by the courts of the time of the Judiciary Act and thereafter. Courts and commentators, however, looked to Congress to reign in unbridled judicial inherent power. *See Ex parte Kearney*, 20 U.S. 38, 45 (1822) (Story, J.) (explaining that such an abuse, "will be a public grievance, for which a remedy may be applied by the legislature."); *see also Ex parte Wall*, 107 U.S. 265, 302 (1882) (Field, J., dissenting) ("The power to punish for contempt —a power necessarily incident to all courts for the preservation of order and decorum in their presence — was formerly so often abused for the purpose of gratifying personal dislikes, as to cause general complaint, and led to legislation defining the power and designating the cases in which it might be exercised. The act of Congress of March 2, 1831, *c*.99, limits the power of the courts of the United States . . . .").

18

## 2.     The Act of Congress of March 2, 1831

In reaction to abuse of the contempt power by a federal district judge, Congress imposed the first limitation on the lower federal courts' contempt power on March 2, 1831. *See* Rev. Stat. § 725; 4 Stat. 487 ("1831 Act").[11]  In *Ex parte Robinson*, 86 U.S. 505 (1873), although the Court questioned whether that 1831 Act could limit the authority of the Supreme Court which derives its existence and powers from the Constitution, it confirmed that:

> [the 1831 Act] applies to the circuit and district courts there can be no question. These courts were created by Act of Congress. Their powers and duties depend upon the Act calling them into existence, or subsequent acts limiting their jurisdiction. The Act of 1831 is, therefore, to them the law specifying the cases in which summary punishment for contempts may be inflicted.

*Id.* at 511.

Later, *In re Terry*, 128 U.S. 289 (1888) reinforced this holding. In contrasting the state courts' exercise of inherent contempt powers, the Supreme Court held that such power in the federal courts "is not simply incidental to their general power to exercise judicial functions; it is expressly recognized, and the cases in which it may be exercised are defined by acts of Congress." *Id.* at 304 (paraphrasing the 1831 Act: the federal courts "have power, by statute, to 'punish, by fine or imprisonment,' at the discretion of the court, contempts of their authority; provided, that such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said

19

courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person, to any unlawful writ, process, order, rule, decree or command of said courts.'").

The Supreme Court time and again recognized the restrictions imposed by the 1831 Act. In *In re Savin* 131 U.S. 267, 274 (1889), the Court held that the 1831 Act constrains the inherent powers of the lower courts: "The power of the courts of the United States to punish contempts of their authority is not merely incidental to their general power to exercise judicial functions, but, as was said in *In re Terry*, 128 U.S. 289, 304, [] where this subject is considered, is expressly recognized and the cases in which it may be exercised are defined, by acts of congress." Justice Harlan, writing for the Court, opined that:

> The act of 1789 did not define what were contempts of authority of the courts of the United States in any cause or hearing before them, nor did it prescribe any special procedure for determining a matter of contempt. Under that statute the question whether particular acts constituted a contempt, as well as the mode of proceeding against the offender, was left to be determined according to such established rules and principles of common law as were applicable to our situation. *The act of 1831, however, materially modified that of 1789, in that it restricted the power of the courts to inflict summary punishments for contempt to certain specified cases*, among which was misbehavior in the presence of the court, or misbehavior so near thereto as to obstruct the administration of justice.

*Id*. at 275-76 (emphasis added) (*citing Ex parte Robinson*, 86 U.S. at 511).

The next case to consider the statutory the 1831 Act's constraints upon the inherent contempt power was *Eilenbecker v. District Court of Plymouth County*, 134 U.S. 31

_____

(Cont'd from preceding page)

[11] *See* Frankfurter, *supra* note 6, at 1024-29 (outlining abuse of criminal contempt authority by United States District Court Judge James H. Peck, his subsequent impeachment hearing, and resulting passage of the 1831 Act).

20


(1890). There, the Supreme Court held that it is within the province of Congress to limit the contempt power of the lower courts through legislation. *See id.* at 37. The Court explained:

> It will thus be seen that, even in the [1831] act of congress intended to limit the power of the courts to punish for contempts of its authority by summary proceedings, there is expressly left the power to punish in this summary manner the disobedience of any party to any law writ, process, order, rule, decree, or command of said court . . . . [A]nd nothing has ever changed it, *except such statues as congress may have enacted for the courts of the United States, and as each state my have enacted for the government of its own courts.*

*Id.* at 38 (emphasis added).

Courts of the day—sometimes unhappily—respected the restrictions imposed by the 1831 Act and "affirmed its limitation on common law assumptions."[12] Section I of the 1831 Act, as a result of a series of congressional enactments, eventually was codified at Section 401 of Title 18 of the United States Code.[13]

### 3. Further Constraints On The Contempt Power — The Clayton And Norris LaGuardia Acts

Congressional limitations on the contempt powers of the lower federal courts continued into the twentieth century. Most notably, in the Clayton Act of 1914, 38 Stat. 730, ch. 323 (Oct. 15, 1914), Congress provided for trial of a special class of contempts "within the purview" of the Act, provided that the trial of such contempt cases "may be by the court, or, upon demand of the accused by a jury . . . and such trial shall conform, as near as may be, to

---

[12] Frankfurter, *supra* note 6, at 1028.

[13] *See generally id.* at 1037 n. 104. Section I of the 1831 Act became Section 725 under the title, "The Judiciary." In the Criminal Code of 1910, Section 725 became Section 268 of the Judicial Code of 1912 (36 Stat. 1163) (formerly 28 U.S.C. § 385). Congress enacted Section 401 of Title 18 was enacted on June 25, 1948. *See* 62 Stat. 1805.

21

practice in criminal cases prosecuted by indictment or upon information."[14]   Behind the

passage of this provision of the Clayton Act was the policy that in labor controversies large

numbers of workers were subject to criminal contempt on the basis of an injunction and may

have been subject to judicial abuse.[15]   Similarly, Section 11 of the Norris-LaGuardia Act, 47

Stat. 90, ch. 90 (Mar. 23, 1932), provided that any contemnor in a case "arising under the

Act," shall enjoy the right to a speedy and public trial by an impartial jury.  *See United States

v. United Mine Workers of Am.*, 330 U.S. 258, 298 n. 68 (1947).

By enacting the Non-Detention Act, 18 U.S.C. § 4001(a), and the Recalcitrant

Witness Statute, 28 U.S.C. § 1826(a), Congress again exercised its authority over the lower

federal district courts, this time by restricting their power to incarcerate civil contemnors for

more than eighteen months to coerce their compliance with judicial orders issued in court and

grand jury proceedings

**B.**    **The Critical Constraint—The "Non-Detention Act"**
          **Codified At 18 U.S.C. § 4001(a)**

**1.**    **Judicial Interpretation of the Non-Detention Act**

Critical to Armstrong's petition is Congress' limitation on the District Court's

inherent power of civil or criminal contempt to impose sanctions other than incarceration—

the Non-Detention Act, 18 U.S.C. §4001(a).   The Non-Detention Act unambiguously

commands that "[n]o citizen shall be imprisoned or otherwise detained by the United States

except pursuant to an Act of Congress."  *Id.* § 4001(a).  The Supreme Court has made plain

that this provision means precisely what it says: absent a congressional act expressly

---

[14] Frankfurter, *supra* note 6, at 1038-40 & n.107.

[15] *See id.* at 1054.

authorizing detention, the Non-Detention Act "proscrib[es] detention *of any kind* by the United States." *Howe v. Smith*, 452 U.S. 473, 479 n.3 (1981) (emphasis in original); *see also Lono v. Fenton*, 581 F.2d 645, 648 (7th Cir. 1978) (en banc) ("Congress has forbidden non-statutory confinement in federal prisons" under Section 4001(a)).[16]

The United States Court of Appeals for the Second Circuit recently reiterated this literal reading of the statute in *Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003), *rev'd on other grounds*, 124 S. Ct. 2711 (2004). In *Padilla*, the Second Circuit determined that Section 4001(a) prohibits even the President of the United States in time of war from detaining as an "enemy combatant" an American citizen suspected of being associated with al Qaeda and plotting terrorist attacks in this country. *See id.* at 698, 718-22. The Second Circuit made clear:

> Based primarily on the plain language of the Non-Detention Act but also on its legislative history and the Supreme Court's interpretation, we conclude that [Section 4001(a)] applies *to all detentions* and that *precise and specific language authorizing the detention* of American citizens is required to override its prohibition.

*Id.* at 720 (emphasis added); *see also Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564, 597 (S.D.N.Y. 2002) (regarding Section 4001(a): "There is no ambiguity here. The plain

---

[16] The legislative history indicates that the Non-Detention Act's immediate aim was to repeal the Emergency Detention Act of 1950 to prevent the recurrence of round-ups and detentions to which Japanese Americans were subjected during the throes of World War II. *See* H.R. Rep. No 92-116, 92 Cong., 1st Sess. (Apr. 6, 1971), 1971 U.S.C.C.A.N. 1435, 1436. But the Non-Detention Act's broader purpose, - *i.e.*, "to restrict the imprisonment or other detention of citizens of the United States to situations in which statutory authority for their incarceration exists," evinces an undeniably clear legislative intent to outlaw *all* detentions of Americans (not just internments during times of war) absent clear and precise statutory authority. *Id.* 1971 U.S.C.C.A.N. at 1435.

DC1 - 206006.01

language of the statute encompasses all detentions of United States citizens."), *rev'd on other grounds*, 124 S. Ct. 2711 (2004).[17]

As the Second Circuit correctly observed, the Non-Detention Act, by its plain terms, represents a sweeping and categorical reclamation by Congress of all governmental authority to detain United States citizens, except in specific instances in which such detentions are precisely and unambiguously authorized by an "Act of Congress." *See Padilla*, 352 F.3d at 712 (concluding "that the Non-Detention Act serves as an explicit congressional 'denial of authority'" to detain American citizens). Accordingly, through the Non-Detention Act, Congress again has constrained the contempt powers of the lower federal courts. Pursuant to Section 4001(a), before a lower federal court employs the contempt power *to*

---

[17] In *Padilla*, the Second Circuit rejected the Government's contention that Padilla's detention as an "enemy combatant" was authorized by Congress's Authorization for Use of Military Force Joint Resolution, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("Joint Resolution"). *See Padilla*, 352 F.3d at 699, 722-23. The Second Circuit held that the Joint Resolution's grant of authority to the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001" lacked the requisite "clear and unmistakable" language specifically authorizing the detention of American citizens seized on American soil to override the Non-Detention Act's categorical prohibition. *See id.* at 722 (emphasizing that "the Joint Resolution contains no language authorizing detention"). On June 28, 2004, the Supreme Court reversed the Second Circuit's ruling in *Padilla* on a jurisdictional ground (not present here), but was careful to point out that it did not reach, let alone disturb, the Second Circuit's determination that Padilla's detention was unlawful under Section 4001(a). *See Rumsfeld v. Padilla*, 124 S. Ct. 2711, 2715 (2004).

The Second Circuit's Section 4001(a) analysis in *Padilla* also was unaffected by the Supreme Court's ruling in a companion case, *Hamdi v. Rumsfeld*, 124 S. Ct. 2633 (2004) (plurality opinion). In *Hamdi*, the Court concluded that the Joint Resolution's "all necessary and appropriate force" grant of authority was sufficient for purposes of the Non-Detention Act to permit the Government to detain as an "enemy combatant" an American citizen seized in a zone of combat in Afghanistan while actively engaged in armed conflict against United States military forces. *See id.* at 2641. The Court emphasized, however, that its determination was narrowly limited to detentions of United States citizens captured *on the battlefield during a time of war*. *See id.* at 2639. In *Padilla*, the Second Circuit emphasized that Hamdi's battlefield capture was a critical distinction for purposes of the Non-Detention Act, explaining that "to compare [Hamdi's] battlefield capture to the domestic arrest [of Padilla] is to compare apples to oranges." *Padilla*, 352 F.3d at 711, 721 n.29 (quoting *Hamdi v. Rumsfeld*, 337 F.3d 335, 344 (4th Cir. 2003), *rev'd and remanded on other grounds*, 124 S. Ct. 2633 (2004) (plurality opinion)).

Of course, Armstrong, like Padilla, is a detained American citizen who was seized within the United States but under circumstances wholly unrelated to any military operation or "zone of combat." Accordingly, the Second Circuit's decision in *Padilla* controls this case.

24

*incarcerate* a contemnor, it must ground its authority in a specific "Act of Congress." *See* 18

U.S.C. § 4001(a). To be sure, there exist various acts of Congress authorizing imprisonment

for contempt, including Section 401 of Title 18 (criminal contempt) and Section 1826(a) of

Title 28 (civil contempt). Further, the lower federal courts may still exercise their inherent

contempt powers against a contemnor through, *inter alia*, fines, sanctions, or shifting of

attorney's fees insofar as such exercise is consistent with other applicable acts of Congress.[18]

### 2.    Application Of The Non-Detention Act To Armstrong

By its terms, the Non-Detention Act applies here. It is violated when (a) a

"citizen" is "imprisoned" or "otherwise detained" (b) "by the United States" (c) in the absence

of an "Act of Congress" containing clear and precise language specifically authorizing the

detention. *See* 18 U.S.C. § 4001(a); *see also Padilla*, 352 F.3d at 720. In light of Section

4001(a)'s express prohibition against non-statutory detentions, the Government shoulders the

burden to show that Armstrong's detention was properly authorized by Congress. *See id.* at

699. Here the Government cannot meet its burden because, as explained below, each element

of a Section 4001(a) violation is met.

### a.    Armstrong Is A "Detained" American "Citizen"

The first element of a Section 4001(a) violation is easily satisfied here.

Plainly, Armstrong is a United States citizen[19] whose incarceration in a prison cell at the

MCC, where he has been held against his will for more than four and a half years, is by any

standard an "imprisonment" and/or a "detention" contemplated by the Non-Detention Act.

---

[18] As discussed in Section I.C, *infra*, in this case the District Court was limited by 28 U.S.C. § 1826(a) in setting the maximum period of confinement.

25

*See Howe*, 452 U.S. at 479 n.3 (noting that Section 4001(a) "proscribe[es] detention *of any kind* by the United States" (emphasis in original)); *Padilla*, 352 F.3d at 720-21 (finding that Section 4001(a) is unambiguous and "applies to all detentions").

### b.     Armstrong Is Being Detained "By The United States"

Nor is there any question that Armstrong's incarceration for civil contempt is a detention "by the United States" within the meaning of Section 4001(a). To be sure, not only is Armstrong detained pursuant to the Contempt Orders of a judicial officer of a United States District Court, his detention at the MCC is being carried out by agents of the United States Marshals Service, "a bureau within the Department of Justice under the authority and direction of the Attorney General," 28 U.S.C. § 561(a), who in turn is "acting as an officer of the sovereign *United States*." *Quillar v. United States*, 272 F. Supp. 55, 56 (W.D. Mo. 1967) (emphasis added); *see also* 18 U.S.C. § 4001(b); *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995) (observing that the United States Marshals "are members of the Executive Branch" of the United States government); *Johnson v. Avery*, 382 F.2d 353, 355 (6th Cir. 1967) ("[P]rison administration is a function of the executive branch of the [United States] Government . . ."). Thus, the second element of a Section 4001(a) violation is satisfied.

### c.     Armstrong's Detention Is Not Authorized Pursuant To An "Act Of Congress"

Because Armstrong is an American citizen being detained by the United States, his confinement is presumptively unlawful and prohibited unless it is precisely and

---

(Cont'd from preceding page)

[19] "Citizen" as used in Section 4001(a) means a citizen of the United States. *See Tavarex v. Attorney Gen.*, 668 F.2d 805, 809 n.10 (5th Cir. 1982).

DC1 - 206006.01

specifically authorized by an "Act of Congress." *Padilla*, 352 F.3d at 720 (holding that "precise and specific language authorizing the detention of American citizen is required to override [Section 4001(a)'s] prohibition").

In this case, it is absolutely clear that Armstrong's incarceration is predicated on no such authority. As explained in Section I.C, *infra*, Congress has enacted only a single statute that contains the requisite "precise and specific language" authorizing a federal district court to jail a civil contemnor for non-compliance with orders to produce materials like those at issue in this case: the Recalcitrant Witness Statute, 28 U.S.C. § 1826(a). *See United States v. Mitchell*, 556 F.2d 371, 384-85 (6th Cir. 1977). Yet, Section 1826(a) expressly restricts the power of federal district judges to *incarcerate* civil contemnors for more than eighteen months. *See* 28 U.S.C. § 1826(a). As discussed above, in this case the District Court renounced its prior reliance on Section 1826(a) as the basis for incarcerating Armstrong and has labored instead to predicate Armstrong's detention at the MCC for *fifty-five months* — more than three years beyond the time limitation imposed by Congress — on its "general and inherent equitable powers to coerce compliance with its lawful orders." *See Princeton Economic Int'l, Ltd.*, 152 F. Supp. 2d at 458. But if so, then Armstrong's imprisonment at the MCC violated Section 4001(a) from its inception because a confinement order pursuant to a district court's "inherent powers" is, of course, not predicated upon, nor is a substitute for, an "Act of Congress" that Section 4001(a) demands. *See Mitchell*, 556 F.2d at 385 (explaining that "[b]efore the enactment of [Section 1826(a)], there was no limitation on the length of confinement for civil contempt" but now "Congress [has] imposed an 18-month maximum on the length of confinement for civil contempt").

27

In sum, the lesson of *Howe* and *Padilla* is crystal clear: "U.S. citizens are either detained under a congressional grant of authority, or they are detained illegally." Stephen I. Vladeck, Note, *The Detention Power*, 22 Yale L. & Pol'y Rev. 153. 180 (Winter 2004). The District Court's reliance on its inherent contempt power, rather than a statutory grant of authority, to detain Armstrong is a tacit admission that Armstrong's detention is illegal.

## C. Because The Recalcitrant Witness Statute Governs Armstrong's Confinement, The District Court Has Violated This Statute By Detaining Armstrong For Over Four And A Half Years

### 1. The Recalcitrant Witness Statute Applies To A Witness In A Court Proceeding

The Recalcitrant Witness Statute, 28 U.S.C. § 1826(a), is another congressional limitation on the District Court's inherent power to incarcerate civil contemnors. Section 1826(a) explicitly prohibited the District Court (and, by extension, the United States Marshals Service and the Bureau of Prisons, which are bureaus of the Department of Justice that have taken custody of Armstrong and are detaining him pursuant to the District Court's Contempt Orders) from incarcerating Armstrong for more than eighteen months. *See* 28 U.S.C. § 1826(a). Congress specifically established in the Recalcitrant Witness Statute a maximum limit of eighteen months on confinement for civil contempt.

Section 1826(a) provides:

> Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is

> willing to give such testimony or provide such information. *No period of such confinement shall exceed the life of—*
>
> (1)  the court proceeding, or
>
> (2)  the term of the grand jury, including extensions, before which such refusal to comply with the court order occurred, *but in no event shall such confinement exceed eighteen months.*

*Id.* § 1826(a) (emphasis added).[20]

At the time of its enactment in 1970, Congress made clear that Section 1826 "codifies the present law of contempt." 116 Cong. Rec. 35291 (Oct. 7, 1970); *see also* 115 Cong. Rec. 5879-80 (1969) ("Title III of S.30 seeks to codify the present law on civil contempt as it pertains to a witness' refusal to testify before a grand jury or court, or in any proceedings ancillary thereto in violation of a court order"). The federal courts of appeal also have described Section 1826(a) "as codifying the existing practice governing civil contempt for a refusal to comply with a court order to testify or to produce documents." *In re Grand Jury Investigation (Joseph Braun)*, 600 F.2d 420, 425-26 (3d Cir. 1979) (citing H.R. Rep. No. 91-1549, 91 Cong., 2d Sess. 46, *reprinted in* 1970 U.S.C.C.A.N. 4007, 4022); *see also In re Kitchen*, 706 F.2d 1266, 1271 (2d Cir. 1983) ("The enactment of § 1826 in 1970 has always been characterized as a codification of existing law, both procedural and substantive, on civil contempt."); *In re Cueto*, 443 F. Supp. 857, 860 (S.D.N.Y. 1978) (describing Section 1826 as

---

[20] Although the italicized language limiting coercive confinement to eighteen months appears in subparagraph (b) of Section 1826 that refers to grand juries, the legislative history makes clear that it applies to subparagraph (a) as well, thus restricting the duration of confinement in both grand jury and any other court proceedings to the shorter of either the life of the proceeding or eighteen months. *See* H.R. Rep. No. 91-1549, 91 Cong., 2d Sess. 46, *reprinted in* 1970 U.S.C.C.A.N. 4007, 4022.

29

"a statute which, in 1970, codified the long standing civil contempt practice in the federal courts with respect to recalcitrant witnesses before a court or grand jury").[21]

The codification of a common law principle supplants the common law for the subject matter covered by the statute, *i.e.*, the common law ceases to apply once it is codified. *See, e.g., Continental Cas. Co. v. United States*, 314 U.S. 527, 533 (1942) ("Whatever may have been the powers of the courts of the United States before the statute, those powers are now regulated by statute."); *New Jersey v. New York*, 283 U.S. 336, 348 (1931) (holding that federal common law is subject to the "paramount authority of Congress"); *Committee for Consideration of Jones Falls Sewage Sys. v. Train*, 539 F.2d 1006, 1008 (4th Cir. 1976) (*en banc*) (holding that "when Congress addresses a question previously governed by a decision rested on federal common law, the need for such an unusual exercise of lawmaking by federal courts disappears"); *Texas v. Pankey*, 441 F.2d 236, 241 (10th Cir. 1971) (federal common law applies "[u]ntil the field has been made the subject of comprehensive legislation or authorized administrative standards"). Thus, Section 1826(a) replaces common law civil contempt jurisprudence for all conduct that falls within its purview.

This assertion is supported by the Supreme Court's holding that the district courts should be particularly circumspect in recognizing an inherent power when it provides a means to circumvent the provisions of a federal statute or rule. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). To allow otherwise "would confer on the judiciary

---

[21] *See also Melickian v. United States*, 547 F.2d 416, 417 (8th Cir. 1977) ("Section 1826 codifies the common law powers of the court to deal with recalcitrant witnesses in a trial or grand jury context."); *Palmer v. United States*, 530 F.2d 787, 788-89 (8th Cir. 1976) (per curiam) (observing that the legislative history of Section 1826(a) also supports a broad construction of its language in that the statute "was intended to codify present civil contempt practice with respect to recalcitrant witnesses in Federal grand jury and court proceedings . . ." (quoting H.R. Rep. No. 91-1549, at 46, 1970 U.S.C.C.A.N. at 4008)). *See also infra* at 33-36.

discretionary power to disregard the considered limitations of the law it is charged with enforcing." *United States v. Payner*, 447 U.S. 727, 737 (1980). Accordingly, a "district court should rely on text-based authority derived from Congress rather than inherent power in every case where the text based authority applies." *Chambers, v. NASCO, Inc.*, 501 U.S. 32, 64 (1991) (Kennedy, J., dissenting) (citing *Societe Internationale v. Rogers*, 357 U.S. 197, 207 (1958) and *Bank of Nova Scotia*, 487 U.S. at 254). This is in accord with the principle that "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Christensen v. Harris County*, 529 U.S. 576, 583 (2000).

In the context of contempt, the Supreme Court has made clear that "Congress retains the exclusive and absolute power to regulate any power of contempt exercised in the federal judiciary." *Michaelson v. United States ex rel. Chicago*, 266 U.S. 42, 66 (1924); *ICC v. Brimson*, 154 U.S. 447, 489 (1894) (holding that "the inherent power [to punish for contempt] is recognized and enforced by statute."). The Court has long recognized that a district court lacks jurisdiction to impose a contempt sanction that is inconsistent with the statutory authority conferred by Congress. *See Ex parte Robinson*, 86 U.S. at 510-511.

### 2. The Recalcitrant Witness Statute As Applied To Armstrong

The District Court imprisoned Armstrong for civil contempt not only because he failed to produce to the Receiver corporate assets demanded by the Turnover Orders, but also because the District Court did not believe that Armstrong provided a full explanation as to the disposition and/or whereabouts of those missing items. (*See* Ex.17, at 199, lines 13-18.) At the District Court's insistence, Armstrong was forced to testify at length at the First Contempt Hearing on January 14, 2000 concerning his efforts to comply with the Turnover Orders and, in fact, had barely stepped off the witness stand when the District Court held him

31

in contempt and remanded him to the custody of the United States Marshals Service. (*See id.* at 196, lines 14-15.) Thus, because the District Court ordered Armstrong to be incarcerated for civil contempt for refusing "to comply" with "an order of the court" to "testify" further and to produce "other information" and "other materials" in the January 14, 2000 "proceeding before" the "court," Section 1826(a) applied and limited the duration of Armstrong's confinement to a congressionally-mandated maximum period of eighteen months. *See* 28 U.S.C. § 1826(a)(1)-(2).

The District Court recognized as much at the First Contempt Hearing on January 14, 2000 when it expressly stated that "[t]he court order at this point has an outside limit of 18 months or until [Armstrong] has purged the contempt by production of the documents that have been heretofore ordered last week." (Ex. 17, at 199, lines 22-24.)). In the August 25, 2000 Order, the District Court reiterated that Armstrong's confinement was limited to a period of eighteen months in two separate paragraphs that read:

### III

IT IS FURTHER ORDERED that defendant Martin Armstrong is to be continued to be held in civil contempt of this Court's Temporary Restraining Order, Orders of Preliminary Injunction and Order dated January 7, 2000, for failing to turn over the corporate assets identified in paragraph I of this Order. . . . Pending compliance with paragraph I of this Order or the provision of competent evidence that compliance is impossible, defendant *Martin Armstrong is Ordered to be confined for civil contempt at the Metropolitan Correction Facility for a period not to exceed eighteen months.*

\* \* \* \*

### VI.

IT IS FURTHER ORDERED that defendant Martin Armstrong is to be continued to be held in civil contempt of this Court's

32

> Temporary Restraining Order, Orders of Preliminary Injunction
> and Order dated January 7, 2000, for failing to turn over the
> corporate assets identified in paragraph IV of this Order. . . .
> Pending compliance with paragraph IV of this Order or the
> provision of competent evidence that compliance is impossible,
> defendant *Martin Armstrong is Ordered to be confined for civil
> contempt at the Metropolitan Correction Facility for a period not
> to exceed eighteen months.*

(Ex. 19, ¶¶ III, VI, at 6-7, 8 (emphasis added).) Although the District Court did not

specifically identify Section 1826(a) as the basis for Armstrong's confinement, it nonetheless

was implied by the District Court's use of the words "period of confinement" not to "exceed

eighteen months" that track the language of Section 1826(a).

At the Second Contempt Hearing on July 6, 2001, the District Court, faced

with the approaching eighteen-month anniversary of Armstrong's incarceration, abruptly

changed course, relying instead on its "general contempt powers" to continue the confinement

beyond eighteen months. (*See* Ex. 20, at 24, lines 17-24.) The District Court recognized,

however, that the First Contempt Order was predicated on Section 1826(a). The District

Court stated:

> I seem to have a recollection I may have used that term, but it was
> in connection with a term of 18 months. I may have said
> something like that and, frankly, that was a misstatement because
> that's the term that blocks out the end of a witness' contempt and
> not the exercise of the court's general power. And it's the court's
> general power that we're talking about here.

33

(*Id.* at 25, lines 8-14.)[22]  And, indeed, at that same hearing, the Receiver's counsel acknowledged that "we asked the Court to schedule this hearing today because the [eighteen-month] outside limit for the contempt, the incarceration for Mr. Armstrong, is going to run on July 14." (*Id.* at 3, lines 11-14.).  After the Second Contempt Order, the District Court in its July 17, 2001 opinion continued its effort to explain it about-face, stating that "[a]lthough I did reference eighteen months at the [January 14, 2000] hearing, this was unintentional." *Princeton Econ. Int'l, Ltd.*, 152 F. Supp. 2d at 458 n.2.  This time, the District Court offered an entirely new justification, taking the position that "[t]he 'Recalcitrant Witness' statute is inapplicable to this matter because § 1826 [which] 'sets a maximum limit of 18 months incarceration for *witnesses* found in civil contempt of court,' usually pertains to grand jury proceedings, and does not because of the *ipse dixit* of counsel apply to one under court order to produce missing corporate assets, especially since § 1826 is not cited anywhere in the Contempt Order." *Id.* (emphasis in original).

At the Third Contempt Hearing on January 29, 2003, Armstrong argued, as he did at the prior contempt hearings, that only Section 1826(a) could provide a basis for the civil contempt sanction imposed against him. (*See* Ex. 21, at 7-9).  The District Court again rejected Armstrong's reliance on Section 1826, asserting that "[t]his has nothing to do with the proceeding.  This has to do with an effort to compel certain conduct.  This statute has to do with [a grand jury] proceeding." (*Id.* at 8, line 25, to 9, lines 1-2.).  The District Court's

---

[22] In disavowing its January 14, 2000 explicit statement that Armstrong's confinement had "an outside limit of eighteen months" as a "misstatement," the District Court did not address why seven months later it repeated this misstatement twice in the August 25, 2000 Order. (*See* Ex. 19, ¶¶ III, VI, at 6-7, 8.)

refusal to abide by the congressionally-mandated limitations on its contempt power in dealing with Armstrong was flatly erroneous.[23]

      a.     Section 1826(a) Applies To Non-Grand Jury Proceedings

The District Court's characterization of Section 1826(a) as pertaining only to grand jury proceedings is incorrect. As always, "[t]he starting point in every case involving construction of a statute is the language itself." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976) (internal citations omitted). By its terms, Section 1826(a) applies in "*any* proceeding before or ancillary to *any* court *or* grand jury of the United States." 28 U.S.C. § 1826(a) (italics and bold added). In addition, subparagraph (a)(1) of Section 1826 provides that no period of confinement shall exceed the life of "the *court* proceeding," as opposed to the "term of the *grand jury*," as set forth in subsection (a)(2). *Id.* § 1826(a)(1)–(2) (emphasis added); *see also* 115 Cong. Rec. 5879-80 (1969) ("Title III of S.30 seeks to codify the present law on civil contempt as it pertains to a witness' refusal to testify before a grand jury or court, or in any proceedings ancillary thereto in violation of a court order"). The statute's use of the broad terms "any proceeding before" and "any court" is an unambiguous expression of congressional will to extend the statute's coverage to the farthest corners of the federal judicial process, not just to proceedings before a federal grand jury.

Moreover, the Second Circuit, interpreting Section 1826(a), has held that "the use of the word 'any' indicates that Congress intended this section to apply to bankruptcy

---

[23] The other federal contempt statutes are inapplicable to Armstrong's contempt -- 18 U.S.C. §§ 401 and 3691 apply to criminal contempt, and 18 U.S.C. §§ 6001 and 6002 apply to someone who previously was given immunity. Moreover, a district court lacks authority to grant immunity absent a request by the United States Attorney. *See, e.g., United States v. Perkins*, 138 F.3d 421, 423 (D.C. Cir. 1998); *United States v. Castro*, 129 F.3d 226, 232 (1st Cir. 1997). Even forced grants of immunity are not permitted post-indictment under Fed. R. Crim. P. 15(d). *See United States v. Cassese*, 622 F.3d 26, 29 (2d Cir. 1979).

35

proceedings." *Martin-Trigona v. Belford*, 732 F.2d 170, 174 (2d Cir. 1984). Likewise, other federal circuit courts have long applied Section 1826(a) to a broad range of court proceedings. *See In re Younger*, 986 F.2d 1376, 1378 (11th Cir. 1993) (holding that "the plain language of the statute includes within its scope any proceeding before any court of the United States"); *In re Application of President's Comm'n on Crime*, 763 F.2d 1191, 1201 (11th Cir. 1985) (holding that Section 1826(a) is "applicable to a range of court-related proceedings, including depositions"); *Melickian v. United States*, 547 F.2d 416, 417 (8th Cir. 1977) (holding that Section 1826(a) "empowers the court to hold in civil contempt any witness"); *Palmer v. United States*, 530 F.2d 787, 788-89 (8th Cir. 1976) (per curiam) (noting that Section 1826(a) applies to "Federal grand jury *and court proceedings*" (emphasis added)); *In re Grand Jury Proceedings*, 486 F.2d 85, 92 (3rd Cir. 1973) (holding that Section 1826(a) "applies both to court proceedings and to grand jury proceedings").

In its July 17, 2001 opinion, the District Court overlooked the literal language of Section 1826(a) and the plethora of Court of Appeals cases, in this Circuit and elsewhere, that interpret the statute as encompassing all proceedings before a court of the United States. *See Princeton Econ. Int'l, Ltd.*, 152 F. Supp. 2d at 458 n.2. The District Court instead relied on *Natural Gas Pipeline Co. of Am. v. Fritz*, 853 F. Supp. 236 (S.D. Tex. 1994). *See Princeton Econ. Int'l, Ltd.*, 152 F. Supp. 2d at 458 n.2. In *Fritz*, the court recognized that Section 1826 applies generally to non-grand jury proceedings but, in an exercise of statutory interpretation that is nothing short of remarkable, held "the eighteen month maximum [set forth in Section 1826] is part of the grand jury subparagraph and it applies only to grand

juries, not to confinements in other proceedings." *Fritz*, 853 F.Supp. at 237.[24] The *Fritz* court's sole authority for this selective reading of Section 1826 — the District of Columbia Appellate Court decision in *In re Neal*, 475 A.2d 390 (D.C. App. 1984) — relates to a conviction for criminal contempt after formal proceedings and a trial by jury. *In re Neal* stands for the unremarkable proposition that Section 1826 applies only to a "*summary contempt proceeding*," like the contempt proceedings here, and not a criminal contempt proceeding. *Id.* at 393 (emphasis in original).[25]

The other cases relied on by the District Court in its July 17, 2001 opinion in support of its contention that Section 1826 is inapplicable to non-grand jury proceedings are equally unpersuasive. *See Princeton Econ. Int'l, Ltd.*, 152 F. Supp. 2d at 458 n.2. In *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 109 (2d Cir. 1987), the civil contempt sanction was predicated on the defendants' disregard of a temporary restraining order and preliminary injunction directing them not to dissipate assets of a trust created pursuant to the Perishable Agriculture Commodities Act. *See id.* at 108. The court's only reference to Section 1826 was in connection with its finding that a civil contemnor is entitled to the benefit of the procedures set forth in Fed. R. Crim. P. 42(a). *See id.* at 110. Contrary to the characterization contained in the Second Contempt Order, the court in *Dole* did not draw a

---

[24] In addition to being inconsistent with the literal language of the statute, the *Fritz* court's interpretation of Section 1826, and by extension the District Court's interpretation, is inconsistent with the statute's legislative history. *See* H.R. Rep. No. 91-1549 (Sept. 30, 1970) *reprinted in* 1970 U.S.C.C.A.N., 4007, 4022 ("[a]s amended by the committee confinement is, therefore, limited to the life of the court proceeding *or* the term (including extensions) of the grand jury before which such refusal to comply with the court occurred, but in no event shall confinement exceed 18 months"). *See also supra* note 15.

[25] The *Fritz* court acknowledged that "the eighteen month limitation [imposed by Section 1826(a)] has been applied to other non-grand jury proceedings" but distinguished those cases on the ground that they "involve pretrial matters, as opposed to post-judgment discovery." *Fritz*, 853 F.Supp. at 237. Not surprisingly, the

(Cont'd on following page)

DC1 - 206006.01

"distinction between § 1826 and general contempt powers to coerce compliance with court ordered equitable relief." 152 F. Supp. 2d at 458 n.2. Rather, Section 1826 was not applicable to the contemnor's conduct in that case. Similarly, in *United States ex rel. Thom v. Jenkins*, 760 F.2d 736 (7th Cir. 1985), the defendant was held in contempt for failing to satisfy a judgment entered against him, not for being a "recalcitrant witness." Finally, in *Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Services*, No. 01 Civ. 2691 (RO), 2001 WL 637387 (S.D.N.Y. June 8, 2001), the contempt sanction arose from defendant's non-compliance with a preliminary injunction order directing him to deposit monies into the court registry and therefore was non-testimonial.

In short, the January 14, 2000 First Contempt Hearing before the District Court in this case obviously was a "proceeding before" a "court" within the meaning if Section 1826(a). The Recalcitrant Witness Statute therefore applied.

### b.    Section 1826(a) Applies To "Parties"

There can be no dispute that Section 1826 applies to "witnesses" who are also "parties." It is well settled that a "witness" is one who is called on to engage in a testimonial act, regardless of whether the person is also a party to the case. *See, e.g.; United States v. Hubbell*, 530 U.S. 27, 34 (2000) (holding that "[t]he word 'witness' in the constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character"). If a party cannot also be a witness, then the Fifth Amendment

---

(Cont'd from preceding page)

District Court's reliance here on *Fritz* stopped short of that court's conclusion that Section 1826 applies to "pretrial matters," like those in issue here.

privilege against self-incrimination would be of little consequence. *See Boyd v. United States,*

116 U.S. 616, 638 (1886).

In *United States v. Mitchell,* the United States Court of Appeals for the Sixth

Circuit expressly rejected the argument that Section 1826 does not apply to parties. The court

held that:

> The government argues that since Section 1826 expressly refers to
> "witnesses," it is inapplicable where, as here, "defendants" disobey
> a court order. Nevertheless, we think it was enacted by Congress to
> apply to all instances of the specific conduct described therein. . . .
> The defendants were in fact acting as 'witnesses' when directed to
> produce the information. . . .

556 F.2d at 384. Similarly, in *Martin-Trigona,* the Second Circuit affirmed the district court's

application of Section 1826 to a debtor (*i.e.,* a party) in a bankruptcy proceeding who refused

to answer questions regarding the location of assets. *See* 732 F.2d at 175. The Second

Circuit's prior determination that Section 1826(a) applies to parties in their capacity as

witnesses is dispositive.

Thus, the District Court's determination that Section 1826(a)'s maximum limit

of eighteen months incarceration applies only to "witnesses found in civil contempt of court"

and not to parties to an underlying suit, *Princeton Econ. Int'l, Ltd.,* 152 F. Supp. 2d at 458 n.2

(emphasis added), is simply incorrect and of no moment in any event because Armstrong *was*

a witness at the January 14, 2000 First Contempt Hearing in which the District Court held him

in civil contempt.

39

DCI - 206006.01

### c.    Section 1826(a) Applies To The Corporate Assets Demanded By The District Court's Turnover Orders

The District Court also was wrong in concluding that the Recalcitrant Witness Statute is inapplicable to a "court order to produce missing *corporate assets*." *Princeton Econ. Int'l, Ltd.*, 152 F. Supp. 2d at 458 n.2 (emphasis added). Section 1826(a)'s plain language states that it applies not only to non-compliance with court orders "to testify," but also to refusals to "provide *other information*, including any book, paper, document, record, recording or other material." 28 U.S.C.§ 1826(a) (emphasis added). Section 1826(a)'s legislative history explains that the words "other information" are all-encompassing:

> [The Act] defines "other information" to include books, papers, and other materials. The phrase is used in contradistinction to oral testimony. It would include, for example, electronically stored information on computer tapes. *Its scope is intended to be comprehensive, including all information given as testimony, but not orally.*

H.R. Rep. No. 91-1549, 91 Cong., 2d Sess. 46, *reprinted in* 1970 U.S.C.C.A.N. 4007, 4017 (emphasis added).

As explained above, the items demanded by the Turnover Orders that Armstrong was jailed for failing to produce are not merely insignificant run-of-the-mill "missing corporate assets" as the District Court mischaracterized them. *See Princeton Econ. Int'l, Ltd.* 152 F. Supp. 2d at 458 n.2. Rather, these items are identified in the First and Second Indictments as crucial *evidence* going to the very core of the Government's allegations of Armstrong's criminal conduct. Moreover, as paragraph 16 of the MOA makes plain, the Receiver was seeking to compel Armstrong's production of these items in its capacity as an agent of the United States Attorney's Office and the SEC and CFTC largely for the purpose of

40

DCl-206006.01

advancing their respective prosecutions against Armstrong.   (*See* Ex. 11, ¶ 16, at 6.)

Accordingly, there is no question that the broad phrase "other information" in Section 1826(a)

covers these items not only because of the probative evidentiary value of the items themselves

but also because of the compelled "testimonial" aspect inherent in the act of producing them.

*See Hubbell*, 530 U.S. at 38.   Courts have interpreted the phrase "other information" in

Section 1826(a) even more expansively to encompass production of items that are not

communicative in nature.   *See, e.g., Palmer*, 530 F.2d at 789 ("A reasonable interpretation of

the specific phrases 'other information' and 'other material' would encompass handwriting

exemplars" the provision of which "is not communicative testimony protected by the Fifth

Amendment").   As these authorities make clear, Section 1826(a) applies to the "missing

corporate assets" at issue here.

### 3.   The Recalcitrant Witness Statute Supplants Inherent Power To Incarcerate Civil Contemnors For Failure To Testify Or To Produce Other Information

As noted above, the Recalcitrant Witness Statute did not merely supplement

the federal district courts' inherent power to incarcerate civil contemnors — Section 1826(a)

completely replaced it.   Despite this clear abrogation of judicial power, in its July 17, 2001

opinion, the District Court cited to three cases, *Chambers*, 501 U.S. at 44; *Sigety v. Abrams*,

632 F.2d 969, 976 (2d Cir. 1980); and *Shillitani v. United States*, 384 U.S. 364 (1966), to

support its assertion of "general and equitable contempt powers" to incarcerate Armstrong for

recalcitrant witness contempt. *See Princeton Econ. Int'l, Ltd.*, 152 F. Supp. 2d at 459.   None

of these decisions countenance rejection of Section 1826 in favor of general contempt powers.

In *Chambers*, the district court assessed attorney's fees as a sanction for bad

faith conduct during the course of litigation. *See* 501 U.S. at 40-41.   The conduct forming the

41

basis for contempt did not fall within the purview of Section 1826, the Recalcitrant Witness Statute, and the sanction imposed did not result in the incarceration of the contemnor. *Id.* at 41-42. Unlike this case, in *Chambers* there was no statutory authority encompassing the subject matter of the inherent power exercised by the district court.

The contemnor in *Sigety* was incarcerated pursuant to a warrant of commitment for civil contempt issued by a state court, not a federal district court subject to Section 4001(a), for failure to produce records as required by a subpoena *duces tecum.* The issue reached the district court on a writ of habeas corpus. *See* 632 F.2d at 971. Since *Sigety* arose from a New York *state* (not federal) court's incarceration of an alleged contemnor, Section 1826 did not apply. *See id.*

Finally, the decision in *Shillitani* preceded the enactment of Section 1826. At the time that case was decided, there was no statutory basis for the imposition of a civil contempt sanction against a recalcitrant witness; thus, the court's reliance on its general equitable powers was not inappropriate. Significantly, the *Shillitani* court's holding, that a witness could be incarcerated indefinitely for refusing to testify, was a significant factor in Congress's ultimate decision to curtail that power by establishing an eighteen-month limit in Section 1826(a). *See In re Andrews,* 469 F. Supp. 171, 175 (E.D. Mich. 1979). Thus, Section 1826(a) supplants *Shillitani.*

Here, the District Court lacked authority to rely on "general contempt powers" in the face of a federal statute governing the same conduct, as well as in contravention of the unambiguous language of the Non-Detention Act, 18 U.S.C. § 4001(a). For this reason, at

minimum the Second and Third Contempt Orders were improper and Armstrong should be released immediately.

**4.    The District Court Erred By Disregarding The Maximum Limit Of Eighteen Months Confinement For Civil Contempt Established By Congress**

The District Court erred by asserting that it has discretion "to continue Armstrong's contempt indefinitely." *Princeton Econ. Int'l, Ltd.*, 152 F. Supp. 2d at 463. Even if an inherent contempt power to incarcerate a civil contemnor survives the enactment of the Non-Detention Act, 18 U.S.C. § 4001(a)—which it cannot, lest the District Court become a one-person legislature—and that power can co-exist with a federal statute addressing the same subject matter, the eighteen-month limit set by Section 1826(a) must control.

This question was addressed by the Sixth Circuit Court of Appeals in *Mitchell*. There the Court held that, in enacting Section 1826, "Congress imposed an eighteen month maximum on the length of confinement for civil contempt relating to either a court or a grand jury proceeding." *Mitchell*, 556 F.2d at 385. Similarly, in *United States v. Sanchez*, 725 F.2d 29, 31 (2d Cir. 1984), the Second Circuit held that Congress imposed an eighteen month limit as the maximum period during which civil contempt can be coercive, and therefore permissible, without a trial by jury. The issue in *Sanchez* was whether a district court has discretion to find that civil contempt has ceased to be coercive at some point short of eighteen months. Without any mention of Section 1826, the Court held that:

> Congress specified the maximum period that may be found to be coercive; whether the confinement of any particular contemnor has ceased to be coercive at some point within the maximum period requires no showing of grounds for disagreeing with Congress, but only grounds for finding that no realistic possibility exists that the contemnor might yet testify if confinement is continued.

43

*Sanchez*, 725 F.2d at 31.   Notably, the decision in *Sanchez* assumes that a period of confinement in excess of eighteen months would be *per se* impermissible.   In *Braun*, cited with approval by the Second Circuit in *Sanchez*, the contemnor was incarcerated pursuant to Section 1826 "which sets a maximum limit of eighteen months imprisonment for recalcitrant witnesses found to be in civil contempt of court." *Braun*, 600 F.2d at 425.   The Third Circuit held in *Braun* that:

> In this respect, Braun's incarceration differs from the indeterminate period of confinement for civil contempt imposed pursuant to state law and practice that marked the cases in which courts have held that at some point the confinement ceases to be coercive and becomes punitive, thereby raising due process concerns.   This difference is not without significance:   *the maximum limit found in the federal contempt statute reflects a deliberate congressional attempt to resolve the problem of drawing a line between coercion and punishment.*

*Id.* (emphasis added).   The Court further held that "[c]onfronted squarely with the challenge of ensuring that civil contempt not be used to inflict punitive periods of imprisonment, the House subcommittee adopted the suggestion that Title III be amended to add a prohibition against confining a recalcitrant witness for civil contempt for any period in excess of eighteen months." *Braun*, 600 F.2d at 426-27.

The District Court's interpretation would render Section 1826 a nullity.   Based on its practice, a district court could simply circumvent the statute and its eighteen-month limit by relying instead on general contempt powers to incarcerate a contemnor indefinitely.  Such an outcome ignores Congress's express intention.

As originally proposed in the Senate bill, Section 1826 placed no limitation upon the period for which an intransigent witness could be confined. *See* S. 30, 91st Cong. 1st Sess. § 301 (1969).   The absence of any limitation on the period during which a witness could

44

be incarcerated created a firestorm of opposition from those who considered the provision "unduly harsh." *See Braun*, 600 F.2d at 426. The eighteen month outer limit for incarcerating a civil contemnor was adopted by the House subcommittee and ultimately passed by both houses.[26] *See id.* at 427 n.24. The legislative history of Section 1826 demonstrates that Congress clearly considered, and then squarely rejected, the notion that a "recalcitrant witness" could be incarcerated for a period longer than eighteen months. *See also In re Ford*, 615 F. Supp. 259, 260 (S.D.N.Y. 1985) ("[B]y enacting § 1826(a), Congress determined that confinement for up to eighteen months is coercive rather than punitive in nature"); *In re Jean-Baptiste*, No. M 11-188 (PKL), 1985 WL 1863, *4 n.6 (S.D.N.Y. Jul. 5, 1985) ("[t]he eighteen month provision of § 1826(a) was enacted as a limit on the length of sentences for civil contempt, which until then had been within the discretion of the district court"). It defies logic that a district court should be able to avoid Congress's plain pronouncement that civil confinement loses its coercive character at eighteen months simply by punishing the contemnor pursuant to purported inherent powers, rather than the statute that, on its face, applies to the offending conduct. *See Miller v. French*, 530 U.S. 327, 336 (2000) (holding that if "Congress has made its intent clear, 'we must give effect to that intent'") (quoting *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 215 (1962)). Indeed, Section 1826(a) was enacted specifically to remove the length of a civil confinement from the courts' discretion — *i.e.*, from its inherent powers — and to limit the length of civil confinement to eighteen months.

---

[26] Congress was persuaded by criticism that incarceration for contempt beyond eighteen months runs afoul of the Eighth Amendment prohibition against cruel and unusual punishment and *is a deprivation* of due process. *See In*

(Cont'd on following page)

45

**D.    The District Court Had No Authority To Freeze The Defendant Corporations' Assets And Therefore No Authority To Issue The Turnover Orders**

The District Court lacked authority to issue the Turnover Orders that led to Armstrong being held in civil contempt because the District Court had no equitable power to issue an order freezing the Corporate Defendants' assets upon which the Turnover Orders were based.

Pursuant to Section 20 of the Securities Act of 1933 ("Securities Act") and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), the SEC's complaint sought, *inter alia*, (1) an order requiring the Princeton Entities to disgorge "any ill-gotten gains;" (2) an order requiring the Princeton Entities to pay civil monetary penalties, and; (3) an order freezing the assets of the Princeton Entities. (*See* Ex. 5, at 13.) Although the CFTC likewise sought court orders requiring the Princeton Entities to disgorge unlawful gains, make restitution and pay civil penalties, the CFTC's complaint did not seek to freeze the Defendants' assets. (*See* Ex. 6, at 11-13.) Thus, while the District Court's TRO ran to the benefit of the CFTC, the relief was granted to it not pursuant to any federal commodities statute but pursuant only to District Court's equitable powers.

The TRO specifies that the purpose of the asset freeze was to preserve "funds, property and other assets that could be subject to an order of disgorgement or an order imposing civil penalties." (Ex. 10, at 3, ¶ 5). The asset freeze was extended by the District Court's October 14, 1999 preliminary injunction and served as the predicate for its directives

---

(Cont'd from preceding page)

*re Andrews*, 469 F. Supp. at 175 (discussing the Senate testimony of Lawrence Spieser, Director of the American Civil Liberties Union).

DCI - 206006.01

to Armstrong to turnover to the Receiver property belonging to the Corporate Defendants.
(See Ex.13, at 1-4.)

The freeze order was improperly granted, however, because neither traditional
equity powers nor the federal securities statutes relied upon by the SEC authorized the District
Court to freeze the Corporate Defendants' assets to preserve funds to satisfy a potential money
judgment. Indeed, the precise remedy sought and obtained by the SEC -- the prejudgment
"freeze" of assets over which the plaintiff does not have an equitable claim -- was determined
to be impermissible by the Supreme Court in *Grupo Mexicano de Desarrollo v. Alliance Bond
Fund, Inc.*, 527 U.S. 308 (1999).

In *Grupo*, the Supreme Court held that a federal district court does not have the
power to issue an preliminary injunction preventing a defendant from using or transferring
assets in order to preserve monies to pay a potential money judgment. *See id.* at 322-27
(relying, in part, on *DeBeers Consol. Mines, Ltd. v. United States*, 325 U.S. 212 (1945)).
Rather, the equity powers of the district court are confined to (1) those equitable powers
exercised by the English High Court of Chancery at the time the United States Constitution
was adopted, and (2) the equitable powers that since have been expressly conferred by
Congress. *See Grupo*, 527 U.S. at 318-22. The Supreme Court concluded that, because the
equity power of the English High Court of Chancery did not extend to the issuance of a
preliminary injunction for the purpose of preserving a pool of funds to pay a potential money
judgment, such power could not be exercised by the federal district courts.

In this case, the SEC did not have an equitable interest over any specific assets
in the Corporate Defendants' possession that were derived from sales of the Princeton Notes

47

because, as the Government itself acknowledges, the Notes were unsecured. (*See* Ex. 1, at 5, subparagraph c ("[A]ll of the documents I have reviewed to date indicate that the notes are unsecured . . .")). Rather, the relief ultimately sought by the SEC -- disgorgement of allegedly ill-gotten gains and payment of civil monetary penalties -- is merely a claim for fungible money damages. Accordingly, under *Grupo*, the District Court had no inherent equitable power to freeze the Princeton Entities assets. Indeed, the SEC had no entitlement to a prejudgment remedy that holders of the Princeton Notes would have been unable to obtain if they had sued on their own behalf.

Moreover, the language of Section 20 of the Securities Act and Section 21(d) of the Exchange Act, upon which the SEC relied to freeze the Princeton Entities' assets, mirrors the language of Section 4 of the Sherman Act which, according to the Supreme Court's decision in *DeBeers*, confers no greater equity power than the District Court otherwise possessed. *See* 325 U.S at 218-19. Both of these federal securities statutes provide that the SEC may seek "a permanent or temporary injunction or restraining order" against "any person [who] is engaged or is about to engage in any acts or practices" which constitute a violation of the federal securities laws. *See* 15 U.S.C. §§ 77t(b), 78u(d)(1).[27] Similarly, Section 4 of the Sherman Act states that "[t]he several [district] courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of the act." As the Supreme Court held in *DeBeers*, "[t]hat jurisdiction, as we have said, is to be exercised according to the general principles which govern the granting of equitable relief. Since it confers no new or different

---

[27] Although the CFTC may have had a statutory basis for requesting an asset freeze, *see* 7 U.S.C. § 13a-1(a), the statute is not implicated here because the CFTC's Complaint did not seek to freeze the Defendants' assets. (*See* Ex. 6, at 11-13.)

DC1 - 206006.01

power than those traditionally exercised by courts of equity, we are remitted to examination of the practice of such courts, unless [the statute] has enlarged those powers. *Id.* at 218-19. As is true of Section 4 of the Sherman Act, nothing in Section 20 of the Securities Act or Section 21(d) of the Exchange Act confers upon the District Court greater equity powers that it otherwise had. As such, these statutes did not furnish the District Court with the equitable authority to grant the asset freeze obtained by the SEC with respect to the Corporate Defendants.

In sum, since the District Court lacked authority to freeze the Princeton Entities' assets, it therefore lacked any basis to issue the Turnover Orders and to coerce Armstrong's compliance with them by confining him for civil contempt.

## II.  ARMSTRONG'S INCARCERATION VIOLATES HIS RIGHTS UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

The District Court's incarceration of Armstrong violates both the Self-Incrimination and Due Process Clauses of the Fifth Amendment to the Constitution.

### A.  Armstrong's Incarceration For Civil Contempt Despite His Assertion Of His Fifth Amendment Privilege Was Improper

The very foundation of Armstrong's contempt rests on faulty constitutional ground. The Supreme Court has long recognized that the Fifth Amendment privilege against self-incrimination ensures that "a person cannot be compelled to disclose facts before a court . . . which might subject him to a criminal prosecution or his property to forfeiture." *Counselman v. Hitchcock*, 142 U.S. 547, 559 (1892). The privilege may be asserted in proceedings that are civil in nature, *see Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973); *Kastigar v. United States*, 406 U.S. 441, 445 (1972), even when the witness harbors no secrets and has nothing to hide, *see Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (per curiam). Despite these clear

DCI - 206006.01

constitutional principles and Armstrong's timely (and repeated) assertions of his Fifth

Amendment privilege, the District Court directed Armstrong to produce documents and to

testify about the location of items directly related to the subject matter of the criminal

indictment pending against him. The District Court held Armstrong in contempt for failure to

comply with its order. This unconstitutional predicate for Armstrong's contempt sanction

mandates reversal and Armstrong's release from confinement.

### 1.    The District Court's Reliance On *Braswell* Was Erroneous

The District Court relied on *Braswell v. United States*, 487 U.S. 99 (1988), as

the basis for its order compelling Armstrong to produce and to testify notwithstanding

Armstrong's assertion of his Fifth Amendment privilege. (*See* Ex. 16, at 75-76, 97-98, 100.).

*Braswell* held that "a custodian of corporate records may not resist a subpoena for corporate

records on Fifth Amendment grounds," for the simple reason that, because a custodian acts as

the corporation's representative, his act of production is deemed that of the corporation, which

enjoys no privilege against self-incrimination. 487 U.S. at 106, 110. The District Court's

misapplication of *Braswell* to Armstrong's situation was plain error because "*Braswell* is not

coextensive with a Fifth Amendment privilege." *In re Three Grand Jury Subpoenas*, 191

F.3d 173 (2d Cir. 1999).

### a.    *Braswell* Does Not Apply Post-Indictment

*Braswell* cannot reasonably apply after the witness has been indicted. The

*Braswell* Court indulged the fiction of the "collective entity" doctrine and ignored the rights

of the individual witness, but only because he had not been indicted. Armstrong, on the other

hand, was an indicted criminal defendant when he was ordered to produce documents and

assets on behalf of the Princeton Entities. And a criminal defendant he remains. Once an

50

indictment is filed, the defendant enjoys absolute immunity from compelled testimony. Indeed, in *United States v. Hubbell*, 530 U.S. 27, 29 (2000), the Court held that because such a high level of protection is to be afforded to a defendant, especially one who is currently the subject of an outstanding criminal indictment, a grant of immunity under 18 U.S.C. §§ 6002 or 6003 must be provided.

The reasons for not permitting compelled testimony post-indictment are at least twofold. First, any other result would "allow the revival of a modern version of the ancient English Star Chamber."[28]  *United States v. Doss*, 563 F.2d 265, 277 (6th Cir. 1977) (en banc). Second, "the government's advantage in seeking wide-ranging discovery through this mechanism would be very great." *Id.* at 277. As the Sixth Circuit explained:

> The tremendous advantage which the prosecution could gain by subjecting an indicted defendant to such a private inquisition just before trial would make a fundamental change in the American constitutional system of adversarial trial as set forth in the Fifth and Sixth Amendments. Nor could such abuse be cured by the trial court's sustaining objections to grand jury evidence thus procured. . . . [T]he knowledge gained by the prosecutor from the defendant's own mouth as to sensitive areas and potential witnesses would be invaluable to him even if the prosecutor never tendered a line of grand jury testimony for admission at the subsequent trial.

*Id.* at 277.

The District Court thus erred in applying *Braswell* post-indictment and precluding Armstrong from asserting his right to absolute immunity from compelled testimony.

---

[28]  For a discussion of the tyranny practiced by the Star Chamber, *see Hubbell*, 530 U.S. at 35 n.8; *Faretta v. California*, 422 U.S. 806, 821-27 and nn. 17 and 18 (1975).

DC1 - 206006.01

b.    **The District Court Erred In Failing To Recognize That The**
      ***Braswell* Doctrine Has Been Substantially Undermined By**
      ***Hubbell***

The categorical nature of *Braswell* has been brought into question by the Supreme Court's decision in *Hubbell*.[29]  In *Hubbell*, the Court recognized that "the act of producing documents in response to a subpoena may have a compelled testimonial aspect" that implicates the Fifth Amendment privilege against self-incrimination.  530 U.S. at 36. The Court reasoned that

> when the custodian of documents responds to a subpoena, he may
> be compelled to take the witness stand and answer questions
> designed to determine whether he has produced everything
> demanded by the subpoena. The answer to those questions, as well
> as the act of production itself, may certainly communicate
> information about the existence, custody and authenticity of the
> documents.

*Id.*  *Hubbell*'s acknowledgement that a custodian's act of production has testimonial significance directly undercuts *Braswell*'s blanket pronouncement to the contrary.

The District Court disregarded *Hubbell*'s contraction of the *Braswell* doctrine, instead directing Armstrong to do what was expressly proscribed by the *Hubbell* court. Complying with the District Court's production order would have required Armstrong to perform acts that are testimonial in nature, *i.e.*, by producing the documents and assets, he would be admitting to their existence, his custody and control over them, or otherwise disclosing further information as to their whereabouts.  *Hubbell*, 530 U.S. at 37, n.19 (citing

---

[29]  Indeed, the concurring opinion suggests that at least two Justices would be willing to reconsider the *Braswell* act of production doctrine.  *Hubbell*, 530 U.S. at 49 (Scalia and Thomas, JJ., concurring) (noting that "[a] substantial body of evidence suggests that the Fifth Amendment privilege protects against compelled production not just of incriminating testimony but of any incriminating evidence").

DCI - 206006.01

*United States v. Doe*, 465 U.S. 605, 613 n.11 (1984)); *Fisher v. United States*, 425 U.S. at 409, 410-413 and 432 (1976); *Braswell*, 487 U.S. at 104; *id.* at 122 (Kennedy, J., dissenting).

The District Court compounded its error by demanding that Armstrong provide a "competent explanation" for non-production, stating that it would not accept a "Fifth Amendment explanation" or a "rank hearsay explanation," thus requiring Armstrong to testify about the location of assets not in his possession. (Ex. 16, at 103-04.) The Supreme Court, however, rejected a similar attempt by the government in *Hubbell*, reasoning that, by requiring the defendant to make such disclosure, "[i]t was unquestionably necessary for respondent to make extensive use of the 'contents of his own mind' in identifying the hundreds of documents responsive to the requests in the subpoena. The assembly of those documents was like telling an inquisitor the combination to a wall safe, not like being forced to surrender the key to a strongbox." 530 U.S. at 43 (internal citation omitted).

The District Court deprived Armstrong of his constitutional right to be free from such compulsion, thus mandating that the Contempt Orders be reversed and that Armstrong be released.

### c.    The District Court Erred In Its Application Of *Braswell*

Even assuming that some vestiges of *Braswell* remain after *Hubbell*, the Contempt Orders are nonetheless erroneous in that the District Court misapplied *Braswell* to the undisputed facts of the case before it.

206006.01

### i.    Armstrong Was Not A "Custodian" Of The Princeton Entities

The "act of production doctrine" set forth in *Braswell* only provides an evidentiary privilege with regard to documents held by a "corporate custodian." *See Braswell*, 487 U.S. at 118. The record is replete with evidence indicating that by the time the District Court issued its Turnover Orders directing Armstrong to produce corporate documents and assets, Armstrong ceased to be a corporate custodian.

In the September 13, 1999 TRO, the District Court appointed a Receiver for the corporations and vested in that Receiver total and unfettered power over the Princeton Entities. (*See* Ex. 10, at 9-11.) For example, the Receiver was expressly authorized to "take and retain immediate possession, custody and control of all assets and property and the books and records of original entry of the Corporate Defendants including, without limitation, all assets and property . . . ." (*Id.* at 9, subparagraph A.)

In October 1999, the Receiver and Joint Provisional Liquidators ("JPLs") appointed by the Supreme Court, Providenciales, in the Turks and Caicos Islands entered into a Memorandum of Agreement ("MOA") regarding the identification, recovery and administration of Defendant PEI's corporate assets that further stripped Armstrong of any power or control over the Corporate Defendants. (*See* Ex. 11.) In paragraph 13(b) of the MOA, the Receiver and JPLs expressly agreed "not to provide any non-public information regarding [the Corporate Defendants] or [their] Assets to Martin Armstrong . . ." (*Id.* ¶ 13(b), at 6.) Moreover, at an October 14, 1999 hearing before the District Court in which it approved the MOA, SEC counsel explained to the District Court that the purpose for

DC1 - 206006.01

appointing the JPLs over the Princeton Entities was to ensure that "Armstrong has nothing more to do with them . . ." (Exhibit 21, at 11-12, hereto.)

Demonstrating its plenary and exclusive power over the Corporate Defendants (and Armstrong's complete lack thereof), on October 14, 1999 the Receiver also consented to the entry of a preliminary injunction on behalf of the Princeton Entities that resolved the SEC's claims against them. (See Ex. 13.) Even though Armstrong had not consented to it, the preliminary injunction also enjoined him from "taking or retaining possession, custody or control of any assets or property" belonging to the Corporate Defendants, "taking any steps to secure or obtain possession of any assets or property of the Corporate Defendants" and "acquiring or exercising any rights or powers which the Corporate Defendants or their affiliates or subsidiaries have to manage control, operate or maintain their businesses (including, but not limited to, the power to direct, hire, suspend, and terminate personnel) or possess, receive, or use income, earnings, rents, or profits." (Id. at 1-2, ¶¶ A, B, D.)[30]

Furthermore, pursuant to a January 6, 2000 amended order, the District Court further expanded the scope of the Receivership by granting the Receiver exclusive dominion and control over the management and assets of all 460 foreign corporate subsidiaries and affiliates of the Corporate Defendants. (See Ex. 12.)

---

[30] Armstrong was not informed that the Receiver had consented to a preliminary injunction on behalf of the Princeton Entities until the October 14, 1999 hearing because the SEC, in complete disregard of Armstrong's legal rights, never served Armstrong with a copy of preliminary injunction even though it applied to him. (See Ex. 21, at 11-12.) SEC counsel explained to the District Court that "[w]e negotiated the order with [the Receiver's counsel] and with the [JPLs]; and because the [JPLs] had taken over the corporations, so that Mr. Armstrong has nothing more to do with them - or the receiver had, whichever way you want to analyze it - we did not show it to Mr. Armstrong." (Id.)

Thus, there is no question that upon the appointment of the Receiver, Armstrong was, as a matter of law, stripped of all authority over the Princeton Entities, including the authority to serve as a corporate custodian. The Supreme Court held in *Bank of Bethel v. Pahquioque Bank*, 81 U.S. 383, 460 (1871), that it is "[b]eyond doubt [that] the appointment of a receiver supersedes the power of the directors to exercise the incidental powers necessary to carry on [the company's business], as the receiver is required to take possession of the books, records, and assets of every description of the association . . . ." The Second Circuit has repeatedly reached the same conclusion. For example, in *Graselli Chemical Co. v. Aetna Explosives Co.*, 252 F. 456, 459 (2d Cir. 1918), the Second Circuit held:

> The appointment of the receiver supersedes the power of the directors to carry on the business of the corporation, and the receivers take possession of the corporation, its books, its records, and assets.

See also *Abm. S. See & Depew v. Fisheries Products, Co.*, 9 F.2d 235, 237 (2d Cir. 1925) (same); *Manhattan Rubber Mfg. Co. v. Lucey Mfg. Co.*, 5 F.2d 39, 40-41 (2d Cir. 1925) (same); *Malone v. Voges Mfg. Co.*, 271 F.2d 230, 231 (2d Cir. 1959) (holding that president of corporation had no authority to enter into contracts after appointment of receiver). The same principle has been applied in cases commenced by the SEC and the CFTC. In *CFTC v. FITC, Inc.*, 52 B.R. 935, 937 (N.D. Cal. 1985), the court held that an officer's commencement of bankruptcy proceedings on behalf of the corporation after the appointment of a receiver was invalid. The court noted that

> Once a court appoints a receiver, the management loses the power to run the corporation's affairs. The receiver obtains all the corporation's power and assets. Thus it was the receiver, and *only*

the receiver, who the Second Circuit empowered with the authority
to place FITC in bankruptcy.

*Id.* at 937 (emphasis in original) (citing *First Sav. & Loan Ass'n v. First Fed. Sav. & Loan*,

531 F. Supp. 251, 255 (D. Haw. 1981)); *SEC v. Spence & Green*, 612 F.2d 896, 903 (5th Cir.

1980), *cert. denied*, 449 U.S. 1082 (1980) (rejecting officer's challenge to a consent decree

entered into between the receiver and the SEC on the grounds that "as a general rule a

receiver . . . holds the sole right to direct the litigation of the corporation with whose care he is

entrusted").

The District Court relied upon the Receiver's contention that (1) Armstrong

was the Receiver's co-custodian or the Receiver could have deemed him one[31] (*see* Ex. 16, at

58-61), and (2) Armstrong had not resigned but rather had taken various actions as a corporate

director (*see id.* at 60-61). The case law makes clear, however, that the appointment of a

receiver divests the prior officers and directors of all powers as a matter law. Any affirmative

acts undertaken by prior officers and directors on behalf of the corporation would be *ultra*

*vires*, and a formal resignation would be unnecessary.

Even if there were no indictment, Armstrong ceased to be a custodian for the

Princeton Entities, traditional Fifth Amendment principles applied. Indeed, the Second

Circuit's decision in *Three Grand Jury Subpoenas*, 191 F.3d 173, was dispositive. There,

three defendants were served with three sets of subpoenas calling for the production of

corporate records. *See id.* at 175. Two of the defendants produced some, but not all corporate

---

[31] Such speculation should not form the basis for a district court's consideration of Constitutional issues.

57

records, and the third defendant did not produce any records. All three defendants then resigned from the company. *See id.*

Three years later, upon learning that certain former corporate employees had corporate records that were not produced in response to the 1996 subpoenas, the government served another set of subpoenas on the three defendants, demanding the production of any and all documents in their "care, custody, possession, or control, that were created during the course of, or in connection with, your employment at the corporation." *Id.* All three defendants refused to produce the corporate records, asserting their Fifth Amendment privileges against self-incrimination. *See id.*

The government moved to compel production, arguing that the records were corporate records, that the three defendants remained "custodians" of the corporation, and that their assertions of the Fifth Amendment privilege was precluded by *Braswell. See Three Grand Jury Subpoenas,* 191 F.3d at 176. All of these arguments were rejected.

The district court in *Three Grand Jury Subpoenas* held that "the act of testimonial [production] on behalf of a person who is no longer with the corporation is self-incrimination in its classic sense of the word, and the Constitution does not permit it." The court emphasized that the "question of testimonial incrimination is at its height when [the document] is produced by a person who is no longer employed by the corporation, because there is an inference that [he] may have stolen [it]." *Id.*

The Second Circuit agreed and refused to require compliance with any of the subpoenas -- regardless of whether they were issued in 1996 while the defendants were still corporate officers or issued in 1999 after they resigned. *Id.* at 181. Relying on its prior

decision in *In re Grand Jury Subpoenas Duces Tecum dated June 13, 1983 and June 22, 1983* ("*Saxon Industries*"), 722 F.2d 981 (2d Cir. 1983), the Second Circuit held that

> once the agency relationship terminates, the former employee is no longer an agent of the corporation and is not a custodian of the corporate records. When such an individual produces records in his possession he cannot be acting in anything other than his personal capacity. In no sense can it be said, as *Braswell* requires, that "the corporation produced the records subpoenaed." Nothing in *Braswell* convinces us otherwise, and neither the government nor the dissent has directed us to any authority for the proposition that the agency relationship between an employee and an employer somehow continues after the employment relationship ends.

*Three Grand Jury Subpoenas*, 191 F.3d at 181. Accordingly, "it is now settled that an individual may claim an act of production privilege to decline to produce documents, the contents of which are not privileged, where the act of production is, itself, (1) compelled, (2) testimonial, and (3) incriminating." *Id.* at 178.

Given the Second Circuit's decision in *Three Grand Jury Subpoenas*, the District Court erred in rejecting Armstrong's assertion of his Fifth Amendment privilege against self-incrimination.

## ii. *Braswell* Does Not Authorize Compelled Testimony Of The Custodian

Even assuming *arguendo* that the District Court correctly relied on and applied *Braswell* in compelling Armstrong to produce documents and assets on behalf of the corporations, the District Court erred in compelling him to give oral testimony about those documents and about assets not produced.

In *Curcio v. United States*, 354 U.S. 118, 123-24, 127-28 (1957), the Supreme Court drew a distinction between an order compelling a custodian to produce corporate documents and assets in his possession as opposed to an order compelling him to give oral

DC1 - 206006.01

testimony about the location of assets not in his possession. The Court held that the former would be consistent with the Fifth Amendment privilege against self-incrimination, but the latter would not. *See id.* at 128.

Curcio had been served with two subpoenas addressed to him in his capacity as secretary-treasurer of a local union; one subpoena required that he produce union books, the other that he testify. *See id.* at 119. Curcio appeared before the grand jury, stated that the books were not in his possession, and refused to answer any questions as to their whereabouts. *See id.* Curcio was held in contempt for refusing to answer. *See id.* at 121. The Supreme Court reversed the contempt citation, rejecting the government's argument that the custodian has no privilege with regard to the production of corporate books and records and therefore cannot assert the privilege with respect to questions seeking to ascertain the whereabouts of books and records which have been subpoenaed but not produced. *See id.* at 128. The Court held that:

> The Fifth Amendment suggests no such exception. It guarantees that 'No person . . . shall be compelled in any criminal case to be a witness against himself . . .' A custodian, by assuming the duties of his office, undertakes *the obligation to produce the books of which he is custodian in response to a rightful exercise of the State's visitorial powers. But he cannot lawfully be compelled, in the absence of a grant of adequate immunity from prosecution, to condemn himself by his own oral testimony.

*Id.* at 123-24.

Moreover, the Court noted that the government's requests of the defendant went beyond mere identification and authentication of the corporate records:

> [I]n the instant case, the Government is seeking to compel the custodian to do more than identify documents already produced. It seeks to compel him to disclose, by his oral testimony, the whereabouts of books and records which he has failed to produce.

60

It even seeks to make the custodian name the persons in whose possession the missing books may be found. Answers to such questions are more than 'auxiliary to the production' of unprivileged corporate or association records.

*Id.* at 125.

Similarly, the Second Circuit has held that it is impermissible for a district court to predicate a contempt sanction on a defendant's refusal to answer questions regarding the location of documents not produced in response to a court order. In *United States v. Edgerton*, 734 F.2d 913 (2d Cir. 1984), Edgerton was served with an IRS summons requiring him to give testimony and produce tax documents. *Id.* at 915. When Edgerton failed to testify or produce documents, the IRS sought, and the district court issued, an order enforcing the summons and directing him to appear at the IRS office, produce documents and give testimony. *Id.* at 915-16. Edgerton appeared, but produced no documents and asserted the Fifth Amendment privilege with respect to virtually every question asked of him. *Id.* at 916. The district court then held a contempt hearing and found that the order enforcing the IRS summons had not been complied with. *Id.* The district court stated that "we will cut right through that and go right to the questions which the law provides that you should be asked, and I will ask those questions at the behest of the Government." *Id.* The district court said "we're not dealing here with refusal to answer questions . . . What we're talking about here is document production . . ." (*Id.* at 916), and then set forth its intended procedure:

> So it is the Court's intention in that connection merely to ask the three elements that really were considered by the Ninth Circuit in *Rylander*, and that is, as of right now, . . . . there are only three significant questions. One, do the documents which are set forth in the Collection Summons in those categories exist at the present time? . . . Second, are they currently within his possession or control? And third, does he regard them as being private documents?

61

*Id.* at 916. Edgerton declined to answer any of the questions. *Id.* The district court then held

that Edgerton would be sentenced "on a coercive basis of civil contempt, and you are

confined until such time as you answer the three questions that I have put to you on this

record today." *Id.* at 917.

In vacating and remanding the district court's contempt order, the Second

Circuit rejected the Government's claim that Edgerton was held in contempt for non-

compliance with the order enforcing the IRS summons, distinguishing the case before it from

cases such as *Rylander*, where the witness was held in contempt solely for failing to produce

requested documents. *Id.* at 919-20. Rather, in *Edgerton*, as here, the witness was held in

contempt for failing "to answer certain questions posed by the court regarding the existence

and whereabouts of certain" documents and assets. *Id.* at 922.

> The *Edgerton* Court recognized the difficult nature of its ruling:
>
> This case presents the anomalous situation of a conscientious
> district court displaying the patience of Job in dealing with an
> obstreperous taxpayer determined to thwart and mock the very
> concepts of justice which he solemnly invoked in the name of the
> Constitution of the United States. And yet we are compelled to
> vacate the contempt order which the district court felt constrained
> to enter. We do so because a district court, in exercising the
> awesome power of contempt, must turn square corners.

*Id.* at 915. As in *Edgerton*, Armstrong's "key to the jail cell" is predicated on providing an

"explanation" as to why certain documents and assets were not produced and as to their

whereabouts. (Ex. 17, at 199, lines 18-21.) But requiring a witness to provide such testimony

in order to be released from incarceration for contempt is wholly impermissible.

Here, Armstrong complied fully with the Turnover Orders to the extent they

were consistent with *Curcio*. At the *Braswell* Hearing, Armstrong expressly preserved his

DCI - 206006.01

Fifth Amendment privilege, but agreed to "comply and turnover whatever he has in his possession." (Ex. 16, at 98-99.) However, this was not enough for the District Court. The District Court stated "I don't accept the language 'whatever he has'" (*id.* at 100-01), and that "if there is nonproduction [of any of the items ordered by the court], I'm going to want a competent explanation. I don't want a Fifth Amendment explanation. I don't want a rank hearsay explanation," (*id.* at 103-04). The District Court's mandate that Armstrong provide testimony to explain the whereabouts of the assets subpoenaed but not produced — Fifth Amendment be damned — is directly inconsistent with *Curcio* and *Edgerton*. Once Armstrong agreed to produce the things within his custody and control, the District Court could do no more. It was wholly impermissible for the District Court to demand that Armstrong testify as to the location of assets that the District Court deemed "missing" and then to hold him in contempt for failure to comply.

### iii.   *Braswell* Does Not Apply To Personal As Opposed To Corporate Records

Remarkably, at the hearing on January 14, 2000, the Receiver went so far as to ask Armstrong about the whereabouts of his *personal* records. That interrogation blatantly exceeded the scope of what would be permissible under even the most expansive reading of *Braswell.*

The following questions and answers were exchanged between the Receiver and Armstrong at the January 14, 2000 hearing:

"**Q:    Where are your personal papers, sir?**

"**A:    Some of my personal things are also in the hands of the lawyers.**

"**Q:    And do you have any personal papers that are not in the hands of the lawyers?**

63

"Mr. Feld [Armstrong's counsel:] Objection, your honor.

"The Court: I will permit that.

"Mr. Feld:  The question is [sic] whether he any corporate records.  The personal papers are personal papers.

"Mr. Cohen [temporary receiver:]  We'll get to what is personal and corporate in a minute.

"The Court: That's overruled."

(Ex. 17, at 184, lines 1-12.)

The District Court plainly erred in overruling Armstrong's objection to questions concerning personal papers, thus mandating that the Contempt Orders be reversed. *See United States v. Kordel*, 397 U.S. 1, 7 (1970) (a corporate officer still retains his personal right to assert the Fifth Amendment privilege); *Boyd*, 116 U.S. at 634 (holding that "a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the Fifth Amendment").

    iv.    **The Fifth Amendment Privilege Applies To The Corporate Records And Assets Covered By The Turnover Orders**

In a December 11, 2003 order, the District Court determined that Armstrong's production of the corporate assets demanded by the Turnover Orders would not violate his Fifth Amendment rights because "the items themselves do not have any arguable personal incriminatory content" and because under *Braswell* "any fact concerning the *production* of demanded items cannot be used against him." *SEC v. Princeton Econ. Int'l, Ltd.*, 294 F. Supp. 2d 550, 551 (S.D.N.Y. 2003) (emphasis in original).  Both conclusions were wrong.

64

First, the District Court ignored that paragraph six of the First Indictment (and now paragraph 13(c) of the Second Indictment) plainly refers to these same assets as fruits of Armstrong's purportedly criminal conduct that provided him a motive to engage in the alleged fraud. (*See* Indictment ¶ 6.) Thus, the items themselves are incriminating evidence the government could use to convict him. *See Hoffman v. United States*, 341 U.S. 479, 486 (1951) (noting that the privilege against self-incrimination embraces evidence "which would furnish a link in the chain of evidence" needed to convict); *(Suppressed) v. (Suppressed)*, 109 F. Supp. 2d 902, 904 (N.D. Ill. 2000) (information disclosing assets in defendants' possession that may have been obtained from allegedly illegal conduct "is, without question, information that might tend to incriminate them"). No one can dispute that the assets (*e.g.*, coins, sculptures and antiquities) carry as much probative value as documents identifying them.

Second, The District Court disregarded that *Braswell's* mitigating evidentiary privilege for the act of production does not eliminate the danger of self-incrimination under the circumstances of this case. As the Second Circuit recognized in *In re Three Grand Jury Subpoenas*, the act of production privilege under *Braswell* "is not co-extensive with the Fifth Amendment privilege" against self-incrimination and does "not extend to evidence derived from that production." 191 F.3d at 182. Nor does *Braswell* protect against the hazard that the compelled testimonial aspect inherent in the act of production may result in the tacit communication of incriminating information as to the existence, whereabouts, custody and authenticity of items produced. *See Hubbell*, 530 U.S. at 36. And, *Hubbell* made clear that such "[c]ompelled testimony that communicates information that may 'lead to incriminatory

DC1 - 206006.01

evidence' is privileged even if the information itself is not inculpatory." *Id.* at 38 (quoting *Doe*, 487 U.S. at 208 n.6)).

### 2. Because Armstrong Testified Only To The Extent Required By *Rylander*, He Did Not Waive His Fifth Amendment Privilege Against Self-Incrimination

In its July 17, 2001 opinion, the District Court incorrectly determined that the Turnover Orders did not infringe upon Armstrong's Fifth Amendment privilege against self-incrimination because Armstrong had waived his privilege at the January 14, 2000 hearing "when he testified regarding the factual circumstances surrounding the [corporate assets] and, moreover, that he no longer had possession of these items . . ." *SEC v. Princeton Econ. Int'l, Ltd.*, 152 F. Supp. 2d 456, 460 (S.D.N.Y. 2000). According to the District Court, "had [Armstrong] wished to remain silent for fear of self-incrimination at that time, he could have done so by asserting the Fifth Amendment." *Id.* at 461.

The District Court's determination was wrong both as a matter of fact and law. First, although in the July 17, 2001 order the District Court took the position that Armstrong could have preserved his Fifth Amendment privilege by asserting it at the January 14, 2000 hearing, the District Court conveniently ignored that at the January 7, 2000 *Braswell* hearing it explicitly warned Armstrong that asserting the privilege was not an option available to him. (*See* 1/7/00 Hearing Tr. at 103-04.) At the January 7, 2000 hearing, the District Court stated that "if there is nonproduction, I am going to want a competent explanation. *I don't want a Fifth Amendment explanation.* I don't want a rank hearsay explanation." (*Id.* (emphasis added).) Indeed, the District Court made very clear to Armstrong on January 7, 2000 that unless he wanted to be jailed for contempt, an explanation for non-production of any items sought by the Turnover Orders would have to come from him and not in the form of an

66

assertion of the Fifth Amendment privilege. Having compelled Armstrong to testify at the January 14, 2000 contempt hearing one week later, in which the District Court demanded that Armstrong explain why he did not produce items the court believed were within his possession, custody or control, the District Court could not later point to the same compelled testimony as a basis for finding that Armstrong had voluntarily waived his privilege.

Second, as a matter of law there was no waiver because Armstrong testified only to the extent necessary to carry his burden of producing evidence of his inability to comply with the Turnover Orders as to assets not within his possession, custody or control. In *United States v. Rylander*, 460 U.S. 752, 760-61 (1983), the Supreme Court explained that a witness defending against a contempt proceeding for failure to comply with an order to produce demanded items on the ground that the witness is unable to produce them must present evidence to support it. In light of the District Court's admonition on January 7, 2000 that Armstrong himself would have to come forward with a non-Fifth Amendment explanation for the non-production of any items sought by the Turnover Orders, on January 14, 2000 Armstrong's counsel prefaced Armstrong's testimony by stating on the record that he would permit Armstrong to testify "limited to *the issue of compliance*" with the District Court's directive, which Armstrong did. (Ex. 17, at 99, lines 15-16 (emphasis added).) Moreover, Armstrong did not specifically testify as to the whereabouts of assets he did not produce because, as he made clear in his testimony, these items were *not* in his possession, custody or control and their whereabouts were unknown to him. Thus, Armstrong did not relinquish the Fifth Amendment protections afforded him under *Curcio*, 354 U.S. at 128 (holding that a custodian cannot be compelled, over a valid assertion of the Fifth Amendment

DCI - 206006.01

privilege, to testify regarding the whereabouts of records the custodian did not produce). Rather, he guarded his Fifth Amendment privilege by testifying only to the extent necessary to fulfill the burden of production imposed on him by *Rylander.* In sum, there was no waiver.[32]

Separate and apart from any issue of Fifth Amendment waiver, it was entirely improper for the District Court to compel Armstrong to take the witness stand post-indictment at the January 14, 2000 hearing in the absence of a governmental grant of immunity. Relying on 18 U.S.C. § 3481, the Second Circuit has recognized the need to give a defendant immunity prior to compelling him to testify post-indictment. *United States v. Daisart Sportswear, Inc.,* 169 F.2d 856, 861-862 (2d Cir. 1948) (holding that "we do not believe that ... a corporate officer may be compelled to testify as to any and all phases of the corporation's activities, without at the same time obtaining a grant of immunity for the incriminating matter he is compelled to disclose"); *see also United States v. Lawn,* 115 F. Supp. 674, 677 (S.D.N.Y. 1953), *aff'd,* 355 U.S. 339 (1958) (improper to call defendant to the stand "without a request on his part"); *see generally United States v. Doss,* 563 F.2d 265 (6th Cir. 1977) (en banc).

---

[32] In its July 17, 2001 order, the District Court also concluded that Armstrong's assertion of the Fifth Amendment privilege was not in good faith, reasoning that since Armstrong claimed he did not have possession, custody or control of the missing corporate assets, his testimony regarding their whereabouts could not incriminate him. *See Princeton Econ. Int'l, Ltd.,* 152 F. Supp. 2d at 461. But the District Court's rationale had been rejected by the Supreme Court only four months earlier in *Ohio v. Reiner,* 532 U.S. 17, 21 (2001) (per curiam), emphasizing that even an innocent witness with nothing to hide may invoke the Fifth Amendment protection against self-incrimination when confronted with the danger of being "ensnared by ambiguous circumstances." Such was the case here. Given that an indictment had been returned against Armstrong that identified corporate assets like those covered by the Turnover Orders as fruits of alleged criminal conduct, Armstrong had a more than reasonable basis to fear that his testimony regarding these items beyond what he was required to proffer to meet his burden of production under *Rylander* was information the Government could use against him.

68

DCL - 206006.01

In addition, by forcing Armstrong to testify post-indictment in a civil proceeding arising out of the same facts and circumstances at issue in the parallel criminal case, the District Court violated "the ancient equity rule that a court of equity will not order discovery that may subject a party to criminal prosecution." *United States v. Hutcheson*, 369 U.S. 599, 608 n.13 (1962) (citing *United States v. Saline Bank*, 1 Pet. 100)). In sum, Armstrong, as an indicted defendant, never should have been forced to testify at the January 14, 2000 hearing and the District Court committed constitutional error by requiring him to do so.

**B.      Armstrong's Continued Incarceration Violates The Due Process Clause Of The Fifth Amendment**

In addition to violating the Fifth Amendment right against self-incrimination, the District Court's contempt orders have violated due process.

**1.      The District Court's Disregard Of Section 1826(a)'s Eighteen-Month Limitation On Confinement For Civil Contempt Violates Due Process**

The District Court's disregard of the eighteen-month limit set forth in Section 1826 implicates due process concerns. The Fifth Amendment's Due Process clause forbids the government to "deprive any person... of ... liberty... without due process of law." The Supreme Court has held that "[f]reedom from imprisonment – from government custody, detention, or other forms of civil restraint – lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Here, there is no question that Armstrong has a substantial liberty interest in "[f]reedom from bodily restraint [that] has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 82 (1992); *see also Parham v. J.R.,*

69

442 U.S. 584, 600 (1979) (noting the "substantial liberty interest in not being confined unnecessarily").

As set forth in Section I.C., *supra*, Congress has set an eighteen month limit as the maximum period for which incarceration remains coercive.[33]  The House Judiciary Committee was persuaded by due process criticisms when it adopted the eighteen month limitation:

> No period of confinement may last beyond the life of the court proceedings or of the grand jury, including extensions of its original term.  The [House Judiciary Committee] has provided *that confinement may not exceed 18 months in any event — a limitation that is considered in keeping with the civil nature of the contempt and the object of inducing obedience to the order.*

116 Cong. Rec. 35192 (Oct. 7, 1970) (emphasis added); *see also Braun*, 600 F.2d at 425.  The Senate Judiciary Committee also was persuaded by criticisms articulated by the then Director of the American Civil Liberties Union, Lawrence Spieser, that extended imprisonment for contempt is unduly punitive rather than coercive:

> Where a witness is subjected to a 3 year confinement and is willing to suffer that, rather than testify, it becomes clear that the coercion is inadequate, as in the case of a mobster who, though imprisoned for years, refuses to testify for fear of torture and death.  The imprisonment has ceased to be coercive and has become punitive.

*In re Andrews*, 469 F. Supp. at 174-75 (quoting testimony of Lawrence Spieser before the Senate Judiciary Committee).  The District Court infringed upon Armstrong's due process

---

[33]  Other than two visits to the hospital and occasionally being transported to and from the Southern District courthouse for hearings, Armstrong has not been permitted to go outside, - *i.e.*, into the open air, for more than four and a half years.

70

rights by confining him for a period in excess of what Congress has deemed consistent with the Constitution.[34]

### 2.    The District Court's Indefinite Confinement Of Armstrong Is A Violation Of Due Process

There can be no dispute that a statute authorizing the summary imposition of indefinite detention is constitutionally infirm. *See Zadvydas*, 533 U.S at 690 (indefinite detention raises a serious constitutional problem); *see also Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2647 (2004) (plurality opinion) ("We reaffirm today the fundamental nature of a citizen's right to be free from involuntary confinement by his own government with out due process of law . . ."); *District of Columbia v. Clawans*, 300 U.S. 617, 626 (1937) (noting that at the time of the adoption of the Constitution, punishment by commitment for an indefinite period no longer was to be employed); *In re Cueto*, 443 F. Supp. at 861 ("Summary proceedings which result in sentences of potential life duration shock the conscience, and thus are regarded as an aberration in an open society committed to the rule of law, grounded in reason and fairness.").

In this case, the District Court's summary orders to confine Armstrong indefinitely for contempt are wholly incompatible with the due process principles articulated in *Zadvydas* and the other foregoing authorities. The District Court's reliance on its "inherent power" to incarcerate Armstrong indefinitely further contravenes due process since a federal

---

[34] The District Court further violated Armstrong's constitutional rights when, *without a hearing and without notice*, it simply allowed Armstrong's incarceration to continue from January 3, 2003, the date on which Armstrong was to be released pursuant to the Second Contempt Order, to January 29, 2003, the date of the Third Contempt Order.

71

court may not do that which would be unconstitutional if undertaken pursuant to a legislative

directive codified by statute. *See Hovey v. Elliott*, 167 U.S. 409, 418-19 (1897).

> 3.   **The District Court's Continuing Incarceration Of Armstrong Is Allowing The Government To Manipulate The Civil Enforcement Proceeding To Gain An Advantage In The Criminal Proceeding**

In a recent case in which the Government improperly manipulated parallel civil

and criminal proceedings to its strategic advantage, the district court described the dangers

that such manipulation poses to a defendant's constitutional rights:

> Because this is a case where the government has undoubtedly
> manipulated simultaneous criminal and civil proceedings, both of
> which it controls, "there is a special danger that the government
> can effectively undermine rights that would exist in a criminal
> investigation . . . using nominally civil means.   In that special
> situation the risk to individuals' constitutional rights is arguably
> magnified."

*SEC v. HealthSouth Corp.*, 261 F. Supp. 2d 1298, 1326 (N.D. Ala. 2003) (quoting *Sterling*

*Nat'l Bank v. A-1 Holdings Int'l, Inc.*, 175 F. Supp. 2d 573, 579 (S.D.N.Y. 2001)).

This case presents just the sort of "special situation" that the *HealthSouth* court

identified as necessitating a heightened degree of judicial scrutiny.   As even the Government

admits, the parallel criminal and civil cases against Armstrong overlap completely.   The

factual and evidentiary issues in both proceedings are identical.   (*See* Ex. 8, at 4 lines 5-6

(stating in open court on October 15, 1999 that the parallel civil enforcement action, in

relation to the criminal proceeding pending against Armstrong, "is the same case, essentially,

only in a civil context." (statement of AUSA Brian Coad); *see also* Ex. 9, at 2 (3/8/04 Letter

from CFTC counsel Lisa A. Rosenthal to Honorable Richard Owen at 2 ("The criminal

72

charges and the civil complaint are predicated on the same alleged conduct, involving the same issues of fact.")))

Thus, it was no accident that the SEC and CFTC commenced their civil enforcement actions against Armstrong on the same day that the United States Attorney's Office filed a criminal complaint against him and obtained a warrant for his arrest. Since then, the Government has manipulated these simultaneous criminal and civil proceedings to its tactical advantage and to deprive Armstrong of important rights to which he is entitled as a criminal defendant. To that end, early on the United States Attorney's Office intervened in the civil suit to block Armstrong from obtaining through civil discovery certain evidence essential to his defense in that proceeding on the ground that such evidence was potentially relevant to the pending criminal case. *See SEC v. Princeton Econ Int'l, Ltd.*, No. 99 Civ. 9667 (RO), 2000 WL 193131 (S.D.N.Y. Feb. 17, 2000). With the Government's improvident blessing, the Receiver inflicted another serious blow by obtaining a court order disgorging retroactively retainers and fees paid to attorneys Armstrong had hired to represent him not only in the criminal case but also in the civil suit, which, as intended, resulted in counsels' withdrawal leaving Armstrong to fend for himself *pro se. See SEC v. Princeton Econ. Int'l, Ltd.*, 84 F. Supp. 2d 443 (S.D.N.Y. 2000). Likewise, the United States Attorney's Office has missed no opportunity to oppose any reasonable modification of the restrictive conditions of Armstrong's confinement at the MCC so as to assist his counsel in preparing his defense in the criminal case. (*See* Exhibit 23, at 35, lines 8-15, *et seq.*, hereto.)

Meanwhile, as a fitting compliment to these tactics, the Government is using the Receiver in the civil suit to collect evidence for its criminal investigation and prosecution

73

of Armstrong. As explained above, paragraph 16 of the MOA expressly mandates that the Receiver and the JPLs "*shall* take all reasonable steps to cooperate with" the United States Attorney in connection with its investigation and criminal prosecution of Armstrong by, among other things, providing the Government with unfettered access to books, records and other evidence obtained in the course of the receivership. (Ex. 11 ¶ 16, at 6 (emphasis added)). Moreover, in paragraph 13(b) of the MOA, the Receiver and the JPLs expressly agreed to conceal from Armstrong any evidence they obtain in the course of their *de facto* criminal probe. (*See id.* ¶ 13(b), at 6.) The Receiver is thus not functioning merely as an officer of the Court engaged in the ministerial task of marshalling corporate property as part of the orderly administration of the receivership. Instead, the Receiver is an agent of the Government charged with collecting evidence and information to aid it in securing Armstrong's criminal conviction.

Particularly offensive to due process principles is the manner in which the Government has employed the broad civil power of the Receiver and the civil contempt in seeking to extract incriminating evidence from Armstrong *himself*, in complete disregard of his rights as an indicted criminal defendant. To be sure, the corporate records and items sought by the Receiver pursuant to the District Court's Turnover Orders are precisely the same items identified in the First and Second Indictments as evidence of Armstrong's alleged criminal activity that go to the heart of the Government's accusations of fraud. (*See* Ex. 4, ¶ 6; Ex. 15, ¶¶ 13(c), 61-63.) The District Court's continuing incarceration of Armstrong is thus allowing the Government to use the confinement for civil contempt as an instrument with which to further manipulate these parallel proceedings by escalating the pressure on

74

DC1 - 206006.01

Armstrong to furnish the Government with incriminating evidence with which to prosecute him (even though Armstrong has steadfastly insisted for four and a half years that he does not have the missing property).

The Government's collusion with the Receiver and its misuse of the civil contempt as a vehicle to further its *de facto* criminal investigation in the civil suit contravenes due process protections conferred upon Armstrong as a criminal defendant and, at the very least, necessitates that this Court grant the writ and review Armstrong's claims with heightened scrutiny to ensure that those rights are protected.

## CONCLUSION

For all of the foregoing reason, Armstrong respectfully prays that his petition for a writ of habeas corpus be granted.

Dated: August 23, 2004

Respectfully submitted,

*Thomas V. Sjoblom / with permission (BRO)*

Thomas V. Sjoblom, Esq.  TS6555
Benjamin R. Ogletree, Esq. BO8887
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, NW
Washington, D.C.  20036
(202) 974-5636

**Attorneys for Petitioner Martin A. Armstrong**

75

DC1 - 206006.01